Filed
D.C. Superior Court
04/18/2017 15:58PM
Clerk of the Court

# Superior Court of the District of Columbia
## CIVIL DIVISION
### 500 Indiana Avenue, N.W., Suite 5000
### Washington, D.C. 20001 Telephone: (202) 879-1133

Commonwealth Land Title Ins. Co.

_____
                                    Plaintiff

vs.                                          Case Number    2017 CA 001930 B

KCI Technologies, Inc., et al

_____
                                    Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Joseph T. Nah (DC Bar: 466174)
_____
Name of Plaintiff's Attorney

8100 Boone Blvd, Ste 600
_____
Address
Vienna, VA 22182

703-245-0292
_____
Telephone

_Clerk of the Court_

By _____
                          Deputy Clerk

Date    **4/12/2017**

如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시오          የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation





### TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA
### DIVISIÓN CIVIL
**500 Indiana Avenue, N.W., Suite 5000**
**Washington, D.C. 20001 Teléfono: (202) 879-1133**

_____
                           Demandante

contra

_____
                           Demandado

Número de Caso: _____

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____
Nombre del abogado del Demandante

_____
Dirección

_____
Teléfono

*SECRETARIO DEL TRIBUNAL*

Por: _____
                   Subsecretario

Fecha _____

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시오        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

Filed
D.C. Superior Court
03/24/2017 00:58AM
Clerk of the Court

## IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### Civil Division

**COMMONWEALTH LAND TITLE INS. CO.**  )
    c/o Fidelity National Law Group  )
    8100 Boone Blvd., Ste. 600  )
    Vienna, VA 22182  )
     )
    *Plaintiff,*  )
     )
**v.**  )    Case No.   2017 CA 001930 B
     )
**KCI TECHNOLOGIES, INC.**  )
*Serve Registered Agent*: Corporation Service Co.  )
    1090 Vermont Ave., NW  )
    Washington DC 20005  )
     )
**and**  )
     )
**WILES MENSCH CORP.**  )
*Serve Registered Agent:* James F. Lee, Jr., Esq.  )
    1211 Connecticut Ave, NW, Suite 425  )
    Washington DC 20036  )
     )
    *Defendants.*  )
_____)

### COMPLAINT

Plaintiff, Commonwealth Land Title Insurance Company ("CLTIC" or "Plaintiff"), by counsel, sues Defendant KCI Technologies, Inc. and Defendant Wiles Mensch Corp., and states as follows:

### PARTIES

1.    CLTIC is a title insurance company authorized to conduct business in the District of Columbia.

2.    Defendant KCI Technologies, Inc., ("KCI") is a Delaware corporation having its business address at 936 Ridgebrook Road, Sparks, Maryland 21152 that is registered as a foreign entity and conducts business within the District of Columbia.

3.      Defendant Wiles Mensch Corp. ("WMC") is a Virginia corporation having its business address at 510 8th Street SE, Washington DC, 20003 that is registered as a foreign entity and conducts business within the District of Columbia.

## JURISDICTION AND VENUE

4.      Jurisdiction and venue is proper in this Court as the claims arise from events and actions that occurred on and/or was related to the real property commonly known as: Lot 41 in Square 0185, 900 16th Street, NW, Washington, D.C., ("Property") situated in the District of Columbia.

## FACTS

5.      On or about April 12, 2007, ICG 16th Street Associates, LLC ("ICG" or "Insured") acquired the Property from the Christian Science Board of Directors of the First Church of Christ ("Seller").

6.      When the acquisition was made, two buildings existed on the Property, the Christian Science Monitor building and the Christian Science Church building.

7.      The Insured's development plan for the Property included the demolition of the two buildings and the construction of a new commercial office building that would extend to the northern boundary of the Property.

8.      For purposes of the acquisition and the development plan for the Property, including the financing and the title insurance of the Property, the Insured hired KCI to obtain an ALTA/ACSM Land Title Survey of the Property pursuant to the Professional Services Agreement Letter dated June 22, 2006 ("KCI Professional Services Agreement").  A copy of the KCI Professional Services Agreement is attached and incorporated hereto as Exhibit A.

9.      KCI conducted and provided the survey dated June 12, 2006 ("KCI 2006 Survey") to the Insured.  A copy of the KCI 2006 Survey is attached and incorporated hereto as

Exhibit B.

10.     The KCI 2006 Survey included the Surveyor's Certification that was made to four parties: (i) the Insured, (ii) Bank of America, N.A., the lending bank of the Insured, (iii) the Seller, and (iv) Plaintiff.

11.     The KCI 2006 Survey, however, did not identify, state, or indicate any encroachment or possible encroachment located at the northern boundary of the Property.

12.     In reliance of the KCI 2006 Survey, the Insured purchased the Property from the Seller.

13.     On April 12, 2007, in reliance of the KCI 2006 Survey, Plaintiff issued an Owner's Policy of Title Insurance No. 06-001361 to the ICG ("2007 Title Policy") for the amount of $9,000,000.  A copy of the 2007 Title Policy is attached and incorporated hereto as Exhibit C.

14.     The 2007 Title Policy contained a survey endorsement that noted that the land of the Property was the same as the land delineated on the plat of the KCI 2006 Survey that was last revised on April 10, 2007 by KCI.

15.     On December 2, 2012, in connection with the Insured's planned redevelopment of the Property, WMC conducted and produced a Boundary, Topographic and Utility Survey ("WMC 2012 Survey") to the Insured. A copy of the WMC 2012 Survey is attached and incorporated hereto as Exhibit D.

16.     The WMC 2012 Survey indicated that between the northern boundary line of the Property and the adjacent building on 1600 K Street, existed a party wall that encroached on the Property between 2 to 3 inches.

17.     On February 2, 2013, in further connection with the Insured's redevelopment of the Property, the Insured engaged WMC by a Professional Services Agreement ("WMC

3

Agreement") "to prepare a survey to include boundary, topographic and utility information to provide an existing conditions base upon which a development team can rely on in the performance of the design work." A copy of the WMC Agreement is attached and incorporated hereto as Exhibit E.

18.     The WMC Agreement provided for WMC to indemnify the Insured for "any and all liability, damages, injuries, losses, costs, and expenses… to the extent caused by the negligence… of [WMC]." *See id.*

19.     WMC conducted and delivered a Boundary, Topographic and Utility Survey dated April 19, 2013 and revised May 2, 2013 to the Insured ("WMC 2013 Survey") wherein, the survey titled *East Elevation Exhibit, 900 16th St. N.W., Gap between Buildings* indicated that there was an encroachment of the adjacent building party wall by 4 inches along the northern border of the boundary line. A copy of the WMC 2013 Survey is attached and incorporated hereto as Exhibit F.

20.     On January 2, 2014, the Insured entered into a revised Work Authorization agreement engaging KCI to produce an ALTA/ACSM Land Title Survey of the Property ("KCI Work Agreement") for the purpose of insuring the ICG's title for the redevelopment of the Property that would include the construction of the new office building. A copy of the KCI Work Agreement is attached and incorporated hereto as Exhibit G.

21.     KCI conducted and provided a ALTA/ACSM Land Title Survey of the Property dated January 21, 2014 and last revised February 20, 2014, designated as KCI Job Nos. 2914899, 04110633, and 16065039.01 ("KCI 2014 Survey"). A copy of the KCI 2014 Survey is attached and incorporated hereto as Exhibit H.

22.     The KCI 2014 Survey included the Surveyor's Certification that was made to: (i) the Insured, (ii) Bank of America, N.A., and (iii) Plaintiff.

4

23.     On March 28, 2014, in reliance on the KCI 2014 Survey, the Insured closed with Bank of America, N.A. for financing of the redevelopment of the Property.

24.     On March 31, 2014, in reliance on the KCI 2014 Survey, Plaintiff issued the Owner's Policy of Title Insurance No. 81306-11156 ("2014 Title Policy") insuring ICG's title in the Property for $104,832,935.  A copy of the 2014 Title Policy is attached and incorporated hereto as Exhibit I.

25.     The 2014 Title Policy contained the same survey endorsement that noted that the land of the Property was the same as the land delineated on the plat of the KCI 2014 Survey.

26.     Following a lengthy permit process and approval from the District of Columbia Historic Preservation Review Board, the Insured initiated the demolition of the existing buildings on the Property.

27.     On March 24, 2014, Oscar Perez, the Director of Design Services for Cooper Carry (the architectural and construction company hired by the Insured) reported to the Insured that he discovered that the party wall encroachment adjoining the 1600 K Building was 8 inches more than the 4 inches indicated in the WMC 2013 Survey relied upon by ICG and Cooper Carry, and thus, a 12 inch encroachment to the Property existed along the northern border of the boundary line.  A copy of the report by Oscar Perez is attached and incorporated hereto as Exhibit J.

28.     As a result of the 12 inch encroachment, the Insured determined that it could not construct the planned building in the intended configuration without the demolition of the encroaching party wall.

29.     This decision was made upon numerous discussions with construction experts, architects, and engineers between March and April of 2014.

30.     The decision was also made for several reasons, the most important of which was

5

(i) construction worker safety and (ii) the substantial delay penalties of approximately $577,000 per month that would be owed beginning on December 1, 2015, to the Property's main tenant, Miller & Chevalier that signed a long-term lease for 84,000 square feet of office space on October 2013.

31.     On September 17, 2014, the Insured tendered a claim on the 2014 Title Policy as a result of the 12 inch encroachment ("Title Claim").  A copy of the Title Claim is attached and incorporated hereto as Exhibit K.

32.     At the time the Title Claim was tendered, the Insured had already incurred costs of $1,777,748 for the demolition of the 12 inch encroachment. *See id.*

33.     On November 17, 2014, the Insured tendered a companion title claim on the 2007 Title Policy as a result of the 12 inch encroachment. A copy of the companion claim letter is attached and incorporated hereto as Exhibit L.

34.     Pursuant to its obligations of the title policies, Plaintiff accepted coverage and investigated the Title Claim.

35.     Plaintiff, in turn, satisfied the Title Claim by making a loss payment of $950,000.00 to the Insured and incurred expenses in the amount of $92,025.31 for a total sum of $1,042,025.31.  A copy of the wire confirmation transmittal of the loss payment to the Insured's counsel is attached and incorporated hereto as Exhibit M.

36.     As of July 24, 2015, the Insured incurred total costs of $2,666,379 for the demolition of the encroaching party wall and a partial delay penalty to its main tenant.  A copy of the itemized statement of costs by ICG for the demolition of the party wall is attached and incorporated hereto as Exhibit N.

## COUNT I –SUBROGATION 2012 and 2013 Survey (negligent breach of contract)
### Against Defendant WMC

37.     Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-36 as if fully set forth herein.

38.     Plaintiff is subrogated to all claims that the Insured had against WMC by virtue of the loss payment to the Insured and the assignment of the Insured's rights and claims to Plaintiff.

39.     WMC had a duty of care of surveyors to take notice of the 12 inch encroachment along the northern border of the Property when conducting the survey of the Property.

40.     WMC breached that duty of care to the Insured by only taking notice of a 2 to 3 inch encroachment in the WMC 2012 Survey and only a 4 inch encroachment in the WMC 2013 Survey, when the actual encroachment that actually existed on the Property was 12 inches.

41.     WMC negligently surveyed the Property in both instances by failing to take notice of the 12 inch encroachment along the northern border of the Property line in the WMC 2012 Survey and the WMC 2013 Survey.

42.     As a direct and proximate cause of the negligence of WMC in both surveys, the Insured incurred damages in the amount of $2,666,379.00 which represents the construction costs and partial delay penalties incurred by the Insured to demolish the portions of the encroachment and to proceed with the development plan and building of the new office building.

WHEREFORE, Plaintiff Commonwealth Land Title Insurance Company as the subrogee of ICG 16th Street Associates, LLC demands judgment against Defendant Wiles Mensch Corp. under Count I, in the amount of $2,666,379.00 in addition to costs, and such other and further relief as this Court may deem just, necessary, and proper.

## COUNT II-NEGLIGENCE KCI 2006 Survey
### Against Defendant KCI

43.     Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1

7

through 42 of the Complaint as is if fully set forth herein.

44.     In the KCI 2006 Survey, KCI signed a Surveyor's Certification for the Property to Plaintiff.

45.     KCI negligently surveyed the Property by further failing to take notice of the 12 inch encroachment and/or failing to provide and inform in the survey that further examination and investigation was needed of a possible encroachment.

46.     On March 24, 2014, the Insured discovered the 12 inch encroachment.

47.     On September 17, 2014, Plaintiff discovered the 12 inch encroachment.

48.     The failure of the KCI 2006 Survey to take notice of the 12 inch encroachment was relied upon by Plaintiff to issue the 2006 Title Policy to the Insured and thus, was the sole and proximate cause of damages to Plaintiff in the amount of $1,042,025.31.

WHEREFORE, Plaintiff Commonwealth Land Title Insurance Company demands judgment against Defendant KCI Technologies, Inc. under Count II, in the amount of $1,042,025.31, costs, and such other and further relief as this Court may deem just, necessary, and proper.

### COUNT III - NEGLIGENT MISREPRESENTATION KCI 2006 Survey
**Against Defendant KCI**

49.     Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1 through 48 of the Complaint as is if fully set forth herein.

50.     Plaintiff issued the 2006 Title Policy based on representations of the KCI 2006 Survey.

51.     The KCI 2006 Survey, however, misrepresented the status of the Property by failing to take notice of the 12 inch encroachment.

52.     This misrepresentations and/or omissions were made during the closing for the

8

sale of the Property that was material to the transaction.

53.    The negligent misrepresentations in the KCI 2006 Survey were intended to and did in fact induce reasonable and justifiable reliance on the part of all the parties to the transaction to proceed in the transaction and for Plaintiff to issue the 2006 Title Policy.

54.    Plaintiff relied on these misrepresentations to its detriment.

55.    As a direct and proximate cause of the negligent misrepresentations by KCI in the KCI 2006 Survey, Plaintiff incurred damages in the amount of $1,042,025.31.

WHEREFORE, Plaintiff Commonwealth Land Title Insurance Company demands judgment against Defendant KCI Technologies, Inc. under Count III, in the amount of $1,042,025.31, costs, and such other and further relief as this Court may deem just, necessary, and proper.

## COUNT IV - SUBROGATION KCI 2006 Survey (Breach of Contract)
### Against Defendant KCI

56.    Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-55 as if fully set forth herein.

57.    Plaintiff is subrogated to all claims that the Insured had against KCI by virtue of the loss payment to the Insured and the assignment of the Insured's rights and claims to Plaintiff.

58.    KCI negligently surveyed the Property by failing to take notice of the 12 inch encroachment and/or failing to provide and inform in the survey that further examination and investigation was needed of a possible encroachment.

59.    As a direct and proximate cause of the negligence of KCI in the KCI 2006 Survey, the Insured incurred damages in the amount of $2,666,379.00 which represents the construction costs incurred by the Insured to demolish the portions of the encroachment and to proceed with the development plan and building of the new office building.

9

WHEREFORE, Plaintiff Commonwealth Land Title Insurance Company as the subrogee of ICG 16th Street Associates, LLC demands judgment against Defendant KCI Technologies, Inc. under Count IV, in the amount of $2,666,379.00 in addition to costs, and such other and further relief as this Court may deem just, necessary, and proper.

## COUNT V-NEGLIGENCE KCI 2014 Survey
### Against Defendant KCI

60.     Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-59 as if fully set forth herein.

61.     In the KCI 2014 Survey, KCI signed a Surveyor's Certification for the Property to Plaintiff.

62.     KCI negligently surveyed the Property by failing to take notice of the 12 inch encroachment.

63.     KCI negligently surveyed the Property by failing to provide and inform in the survey that further examination and investigation was needed of a possible encroachment.

64.     KCI negligently surveyed the Property by declaring in the KCI 2014 Survey that the "Subject property shares no party walls with adjoining properties."

65.     On March 24, 2014, the Insured discovered the 12 inch encroachment.

66.     On September 17, 2014, Plaintiff discovered the 12 inch encroachment.

67.     The failure of the KCI 2014 Survey to take notice of the 12 inch encroachment was relied upon by Plaintiff to issue the 2014 Title Policy to the Insured and thus, was the sole and proximate cause of damages to Plaintiff in the amount of $1,042,025.31.

WHEREFORE, Plaintiff Commonwealth Land Title Insurance Company demands judgment against Defendant KCI Technologies, Inc. under Count V, in the amount of $1,042,025.31, costs, and such other and further relief as this Court may deem just, necessary, and proper.

10

## COUNT VI -NEGLIGENT MISREPRESENTATION KCI 2014 Survey
### Against Defendant KCI

68.     Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1

through 67 of the Complaint as is if fully set forth herein.

69.     Plaintiff issued the 2014 Title Policy based on representations of the KCI 2014

Survey.

70.     The KCI 2014 Survey, however, misrepresented the status of the Property by

failing to take notice of the 12 inch encroachment.

71.     This misrepresentations and/or omissions were made during the closing for the

sale of the Property that was material to the transaction.

72.     The negligent misrepresentations in the KCI 2014 Survey were intended to and

did in fact induce reasonable and justifiable reliance on the part of all the parties to the

transaction to proceed in the transaction and for Plaintiff to issue the 2014 Title Policy.

73.     Plaintiff relied on these misrepresentations to its detriment.

74.     As a direct and proximate cause of the negligent misrepresentations by KCI in the

KCI 2014 Survey, Plaintiff incurred damages in the amount of $1,042,025.31.

WHEREFORE, Plaintiff Commonwealth Land Title Insurance Company demands

judgment against Defendant KCI Technologies, Inc. under Count VI, in the amount of

$1,042,025.31, costs, and such other and further relief as this Court may deem just, necessary,

and proper.

## COUNT VII –SUBROGATION KCI 2014 Survey (Breach of Contract)
### Against Defendant KCI

75.     Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs

1-74 as if fully set forth herein.

76.     Plaintiff is subrogated to all claims that the Insured had against KCI by virtue of

11

the loss payment to the Insured and the assignment of the Insured's rights and claims to Plaintiff.

77.     KCI negligently surveyed the Property by failing to take notice of the 12 inch encroachment.

78.     KCI negligently surveyed the Property by failing to provide and inform in the survey that further examination and investigation was needed of a possible encroachment.

79.     KCI negligently surveyed the Property by declaring in the KCI 2014 Survey that the "Subject property shares no party walls with adjoining properties."

80.     As a direct and proximate cause of the negligence of KCI in the KCI 2014 Survey, the Insured incurred damages in the amount of $2,666,379.00 which represents the construction costs incurred by the Insured to demolish the portions of the encroachment and to proceed with the development plan and building of the new office building.

WHEREFORE, Plaintiff Commonwealth Land Title Insurance Company as the subrogee of ICG 16th Street Associates, LLC demands judgment against Defendant KCI Technologies, Inc. under Count VII, in the amount of $2,666,379.00 in addition to costs, and such other and further relief as this Court may deem just, necessary, and proper.


Respectfully submitted,

FIDELITY NATIONAL LAW GROUP

By:     ___/s/_____
        Joseph T. Nah (466174)
        8100 Boone Boulevard, Suite 600
        Vienna, Virginia 22182
        (T) 703-245-0292
        (F) 703-821-1618
        Joseph.Nah@fnf.com
        *Counsel for Plaintiff*

 Infrastructure Capital Group, LLC
INFRASTRUCTURE AND REAL ESTATE DEVELOPMENT

1600 K STREET, NW, SUITE 650
WASHINGTON, DC 20008
202.783.4700  FAX 202.783.4701

# FACSIMILE

TO   C. Allen Paugh

ORGANIZATION   KCI Technologies

FAX   410.792.7419

CC

FROM   David Stern

SUBJECT   Lot 41 Square 185 ALTA/ACSM Land Title Survey

DATE   June 29, 2006

PAGES   7
(including cover page)

Dear Mr. Paugh;

Attached is the agreement letter signed by David Stern.

Thank you.

Carmolita D. Eugenio

EXHIBIT
A

From: ICG                    2027834701            06/29/2006  10:43 #008 P.002/007

06/29/2006  10:04    4187927419             KCI TECHNOLOGIES            PAGE  02/07



# KCI
TECHNOLOGIES
ENGINEERS · PLANNERS · SCIENTISTS · CONSTRUCTION MANAGERS
14502 Greenview Drive, Suite 100 · Laurel, MD 20708 · 410-792-8080 · (Fax) 410-792-7419

## PROFESSIONAL SERVICES
## AGREEMENT LETTER

June 22, 2006

David C. Stern
Principal
Infrastructure Capital Group, LLC.
1800 K Street NW, Suite 650
Washington, DC. 20006

Reference:  Lot 41 Square 185 ALTA/ACSM Land Title Survey
           KCI Job No. 1606000P

Location:   1601 I Street NW, Washington, DC.

Project:    This project will provide a modern field run boundary survey of the property under
            contract in Lot 41, Square 185 at I Street NW and 15th Street NW in Washington, DC. A
            survey of the 40 parking spaces in the underground garage will also be included.

KCI Technologies, Inc. (KCI) is pleased to submit this professional services agreement (the "Proposal")
to Infrastructure Capital Group, LLC. ("Client") for the work (the "Work") described in detail in the Scope
of Services section of this Proposal.

## SCOPE OF SERVICES:

This Proposal is limited exclusively to the Work as described in this scope of Services sections and
anything not expressly described shall be considered expressly excluded from the Work. KCI proposes
to perform the Work, which is described as follows:

### ALTA/ACSM Land Title Survey

Survey to be prepared according to current 2005 ALTA/ACSM standards and is to include Items 2, 3, 4,
6, 7(a), 7(b)(1), 7(c), 8, 9, 10, 11(a), 13, 14 and 15 of the "Table A" specifications. All other "Table A"
Items are specifically excluded. Note: Regarding locations of utilities, only the six major utilities of water,
sanitary sewer, storm drain sewer, gas, electric power and telephone are to be considered. Locations of
same will be based on above ground, visible evidence/appurtenances only and/or information furnished
to KCI Technologies by others. KCI will address and/or identify setback, parking and building height
restrictions only for the subject property based on the applicable zoning classification as shown in a
certified zoning letter from the DC. Zoning office, obtained by the client.

Survey to include a review of a Commitment for Title Insurance furnished by client, said commitment to
be accompanied by all supporting/underlying documents, instruments, plats, plans, etc., as referenced
within the Commitment, including the vesting deed. Before work can begin KCI Technologies must be
furnished with a copy/copies of the legal description(s) (metes and bounds) portion(s) of the (several)
vesting deed(s) which identify/identifies the property to be surveyed. Only one level of the parking
garage will be surveyed in the area of the 40 parking spaces reserved for Infrastructure Capital Group,
LLC. Work cannot commence until KCI has received a signed agreement.

KCI TECHNOLOGIES, INC.              Employee-Owned Since 1988              WWW.KCI.CON

06/29/2006  10:84    4187927419              KCI TECHNOLOGIES                PAGE   03/07

Infrastructure Capital Group, LLC
1601 I Street NW, Washington DC
June 14, 2006
Page 2 of 4

KCI will provide a completed ALTA/ACSM Land Title Survey of the subject property for review and comment by Friday July 15, 2006 as long as a signed agreement is received by Friday June 23, 2006.

ADDITIONAL WORK

Experience indicates that certain additional items of work may be required or necessary which KCI cannot presently determine or estimate. For this reason the fee for these items is not included in the provisions listed in "Fees and Payments" for the performance of the Work. Further, the performance of these items is not included in the Work unless the item is expressly described as the Work in the preceding Scope of Services section. These additional items of work ("Additional Work") are caused by many factors, usually at the discretion of the Client and/or his construction contractors. They may also be caused by reviewing governmental agency or Client variance/deviation from present policies and standards of reviewing governmental agencies. "Additional Work" may sometimes be referred to as extras, change orders, or add-ons, but for purposes of this Proposal, all such descriptions are intended to be encompassed within the term Additional Work.

FEES AND PAYMENTS

The following fees and payments are for the performance of the Work listed in the Scope of Services above, at the location described above. The fees listed in this Fees and Payment section do not cover any Additional Work (defined herein), or any other services which are not specifically described as part of the Work listed in the Scope of Services above. Payments of any invoice shall be taken to mean that the client is satisfied with the services and is not aware of any deficiencies in those services.

KCI's fee for the Work listed in the scope of Services above will be a lump sum fee which will be invoiced on a percent complete basis and is broken down as follows:

A. ALTA/ACSM Land Title Survey                    Total Lump Sum Fee    $6,400.00

DIRECT EXPENSES AND CHARGES

In addition, we will invoice you at cost + 16% for fees associated with the filing of applications and permits and for reproductions and prints, special mailings and courier fees as requested or required in the normal performance of our services on this project. Mileage will be invoiced at $0.50 per mile. Invoices will be issued on a periodic basis or at the completion of a specific phase of work. Invoices will be due when rendered, and undisputed invoices will be subject to a late charge of two percent per month on any balances remaining over 30 days after the invoice date.

INDEMNIFICATION

KCI agrees, to the fullest extent permitted by law, to indemnify and hold harmless the Client, its officers, directors and employees (collectively, Client) against all damages, liabilities or costs, including reasonable attorney's fees and defensive costs, to the extent caused by the KCI's negligent performance of professional services under this Agreement and that of its subcontractors or anyone for whom KCI is legally liable.

GENERAL PROVISIONS

The General Provisions included in the Open End Contract are specifically made a part of this Proposal. If this Proposal is accepted by Client, then the General Provisions along with the Proposal shall constitute a complete and binding contract between KCI and Client (the "Agreement").

N:\CR\Zicka\Work Authorizations\Georgetown Center\sbrwell\aSurvey 6-13-06.doc

Infrastructure Capital Group, LLC
1601 I Street NW, Washington DC
June 14, 2006
Page 3 of 4

Any other understandings, agreements, promises, inducements or representations are hereby void. Any modifications to the terms and conditions of this Agreement must be made in writing and signed by both parties hereto in order to be valid. The person executing this Agreement on behalf of the Client does hereby warrant that he/she has full authority to do so.

If this Proposal and the General Provisions included in the Open End Contract are satisfactory and acceptable, and fully set forth the terms of our understanding, please sign the Acceptance and return a copy to KCI's office.   This Proposal and the General Provisions will then constitute our entire Agreement.

KCI reserves the right to terminate this contract in the event the Client, in the sole judgment of KCI, fails to establish sufficient credit to warrant proceeding with the work. In such event, Client shall be obligated to pay for all services rendered to date of termination, including any direct expenses, and no work will proceed thereafter unless Client provides a retainer which KCI, in its sole discretion, shall determine to be satisfactory for the continuation of the work.

KCI welcomes the opportunity to serve Infrastructure Capital Group, and looks forward to working with Mr. David Stern on this project. The Project Engineer to be assigned to the Work is Joe Allegra and his telephone number is 301-953-1821.

Very truly yours,

C. Allen Paugh
Associate

pc:      Project Principal
         Contract File
         Proposal File

From: ICG                 2027834701          06/29/2006 10:43 #003 P.005/007

06/29/2006  18:84    4187927419              KCI TECHNOLOGIES              PAGE  85/87

Infrastructure Capital Group, LLC
1601 I Street NW, Washington DD
June 14, 2006
Page 4 of 4

ACCEPTANCE:

Infrastructure Capital Group, LLC., in consideration of the terms and conditions of the Proposal and General Provisions which are fully set forth herein, does hereby accept this Proposal and General Provisions as the complete and final Agreement with KCI Technologies, Inc. for the performance of the Work described herein, and does hereby further agree to comply with all the covenants in this Agreement.

ACCEPTED BY:

Infrastructure Capital Group, LLC,

BY _____
David C. Stern
Principal



# KCI TECHNOLOGIES, INC.

## GENERAL PROVISIONS

The General Provisions set forth herein are incorporated by reference in the Proposal for the performance of certain services described as the "Work" in the Proposal made by KCI Technologies, Inc., a Delaware corporation ("KCI"), dated June 22, 2006 to Infrastructure Capital Group, LLC (Client"). These General Provisions shall constitute, along with the Proposal, a final, complete, and binding agreement (the "Agreement") between Client and KCI upon Client's acceptance of the Proposal. To the extent they are inconsistent or contradictory, the express terms of the Proposal take precedence over the General Provisions.

**1. ACCEPTANCE OR REJECTION OF PROPOSAL**
The Proposal shall be valid for a period of thirty (30) days from the date thereon. Acceptance thereafter shall be conditioned on KCI's reaffirmation of the Proposal. If, upon submission of this Proposal to Client, Client fails to return a signed copy to KCI and Client knowingly allows KCI to proceed with the work, such services shall be deemed performed pursuant to the Proposal and these General Provisions, which shall be binding the same as if the Proposal were fully executed.

**2. ADJUSTMENTS TO QUOTATION (COST ESTIMATION)**
Fees quoted in the Proposal are based on current salaries and operational costs. Unless a lump sum fee is quoted, KCI shall have the automatic right to adjust the fee basis to reflect change in salaries and operational cost on each twelve (12) month anniversary following the date of the Proposal. Estimates stated in the Proposal are provided for convenience of the Client and KCI is not bound by nor does it guarantee such estimates.

Unless expressly identified as a cost item in the fee proposal, KCI's fees do not include sales tax or other governmental levies. In the event that taxes or other assessments are applied to the fees generated by KCI services, the Client agrees that such taxes or assessments shall be added to the fee base quoted herein and shall become due and payable when invoiced by KCI.

**3. CONDUCT OF THE WORK**
All concept, preliminary and final plans prepared by KCI will be submitted to Client for approval prior to or concurrent with submittal to appropriate governmental authorities. If Client does not respond to such plans within five (5) days of receipt, the plans shall be deemed approved by Client. After the Client's approval, any change shall be deemed Additional Work for which KCI shall receive additional compensation. KCI shall not be obligated to incorporate changes requested by Client into its plans if, in the opinion of KCI, such changes would result in a substandard work product.

KCI will make every reasonable effort to provide a survey crew as requested but it cannot guarantee the time within which a survey crew will be available. The size of the survey crew shall be determined by KCI based on the work to be performed. A minimum of four (4) hours shall be charged anytime a survey crew visits a site, all charges being portal to portal.

Client agrees that KCI shall not be liable for work performed by other parties, for the accuracy of data supplied by other parties upon which KCI may rely, or for testing or inspection work performed by others.

Any reference to existing subsurface objects is provided for general reference based on existing information supplied to KCI by the Client or others and such locations are not to be considered exact. At least forty-eight (48) hours before penetrating the ground, Client agrees to contact the local "Miss Utilities" and have a utilities representative on site. In the event KCI's work includes penetration of the ground, Client agrees that KCI shall not be responsible for any loss of damages claimed to result from said penetration unless a direct result of KCI's sole negligence. Client agrees to indemnify and hold KCI harmless from any claim, suit or proceeding for loss or damages to person or property of others relating to said penetration except to the extent said damages are the direct result of KCI's sole negligence.

Client further agrees to indemnify and hold KCI harmless from any loss or damages to KCI personnel or equipment resulting from any ground penetration except when it is the direct result of KCI's sole negligence or when caused by normal wear and tear.

Subsurface and earth fill data are informational only. KCI does not guarantee such data.
Although KCI will attempt to complete all services in a timely fashion, KCI does not guarantee, expressed or implied the time within which such work will be completed.

KCI will warrant work of all subcontractors used to perform services as part of this contract. KCI will also hold liability for the work of same name subcontractors to this contract.

**4. RIGHT OF ENTRY; PERMITS**
Client agrees to provide rights of entry and all permits necessary for the completion of KCI's services under this Agreement at no cost to KCI.

**5. DOCUMENTS**
All documents, including drawings and specifications, prepared or furnished by KCI pursuant to this agreement, are instruments of service and the property of KCI. Client may make and retain copies, subject to Client's compliance with Section 8, herein, but may only use such documents for the purpose described in the Proposal. Any other use shall be prohibited, and Client shall indemnify and hold harmless KCI for any liabilities, damages, losses, claims, and expenses arising therefrom

**6. RISK ALLOCATION**
Client hereby agrees that, to the fullest extent permitted by law, KCI's maximum liability to Client for any and all claims, actions, damages, or losses arising out of or in any way related to KCI's allegedly negligent services or breach of contract provided pursuant hereto shall not exceed the lesser amount of (1) the amount of any insurance coverage available to satisfy any claim made against KCI within the scope of any such coverage in existence at the time that the claim is resolved by way of settlement award or judgment (exclusive of any required deductible), or (2) three times total fees paid to KCI not to exceed $500,000.00 (total fees shall not include direct expenses). Additional coverage may be obtained at client's expense. Failure to exercise option for additional coverage waives any claim of liability beyond such limits. Client further agrees that in no event shall KCI be liable for any claims or damages of any nature (including gross relating thereto) unless such claims and damages are the direct result of KCI's negligent performance of the work under this Agreement.

Plans and designs prepared by KCI are predicated on sound engineering assumptions that must be tested and adjusted as conditions warrant during construction. If Client does not retain KCI for the purpose of construction services for the implementation of the Plans or Designs, then Client agrees to assume the risk of improper implementation and to hold KCI harmless from any loss or damage resulting from the failure to retain KCI to oversee the implementation of its plan or design.

Client further agrees that KCI shall not be responsible or liable for the cost of any and all corrective actions allegedly caused by KCI unless KCI is provided a reasonable opportunity to participate in the decision on said corrective work.

**7. HAZARDOUS SUBSTANCES INDEMNIFICATION**
Client warrants that it has and will comply with all lawful obligations regarding hazardous or toxic substances, and it agrees to indemnify and hold KCI harmless from any loss, damage, expenditure or liability arising out of or in any way relating to the presence, discharge, exposure or release of hazardous or toxic substances of any kind except to the extent it is the direct result of KCI's sole negligence.

**8. PAYMENTS**

Invoices submitted by KCI to Client are due and payable in full from the date of said invoice without recharge and payment shall not be contingent upon receipt of funds from third parties. If an invoice remains unpaid for more than thirty (30) days from the date of the invoice, a service charge of one and one half percent (1-1/2%) per month, eighteen percent (18%) per annum, shall be assessed on all unpaid amounts dating from the date of the invoice. Failure to render full payment within thirty (30) days shall be deemed substantial non-compliance and KCI, at its option, may undertake any or all of the following remedies: (1) stop all work, provided Client is given three (3) days prior written notice; (2) withdraw all certifications and plans previously submitted; (3) assert a lien on the property pursuant to applicable laws; (4) file suit for the collection of said overdue invoice in any Court of competent jurisdiction; and (5) undertake any other remedies accorded it by law or this Agreement. An exercise of one or more of these actions shall not be deemed a waiver of future exercise of other actions. Client agrees to indemnify and hold KCI harmless from any fees and expenses incurred by KCI as a result of Client's non-payment, including but not limited to cost of personnel time, court costs, litigation expenses and attorneys fees (attorneys fees in the amount of twenty five percent (25%) of the unpaid amount or three hundred dollars ($300.00), whichever is greater).

## 9.  ASSIGNS
Client may not delegate, assign, sublet or transfer its duties or interest in this Agreement without the written consent of KCI.

## 10.  SAFETY RESPONSIBILITY
KCI shall not be responsible for any safety precautions or programs of Client or any of Client's contractors or representatives. KCI shall only be responsible for the safety of its own employees.

## 11.  CERTIFICATE OF MERIT
The Owner shall make no claim (whether directly or to the form of a third-party claim) against the Engineer unless the Owner shall have first provided the Engineer with a written certification executed by an independent engineer licensed in the State in which the KCI office submitting this proposal is located, specifying each and every act or omission which the certifier contends constitutes a violation of the standard of care expected of an engineer performing professional services under similar circumstances. Such certificate shall be provided to the Engineer thirty (30) days prior to the presentation of any such claim or the institution of any arbitration or judicial proceeding.

## 12.  TERMINATION
Either party shall have the right to terminate this agreement provided (3) days written notice is given to the other party. In the event of termination, Client shall be liable for payment to KCI for all work performed, and expenses incurred, up to and including the day of termination.

It is understood and agreed that once the Work is started by KCI, only Client or Client's duly authorized rep to so that we shall have the authority to order the work stopped on its behalf and only by giving KCI written notice. Client may exercise the right to terminate only if it has made all payments due and owing to KCI.

It is further understood and agreed that, after a termination of the Agreement has been effected by client or its duly authorized

representative in accordance with the notice referred to herein, Client or its duly authorized representative may, within thirty (30) days of the notice to terminate, order work to resume on the project, provided KCI is given (10) days advance notice in writing as to when work shall resume. If Client fails to resume the work as provided herein, KCI shall have no obligation to resume the Work at any time thereafter.

KCI shall not be obligated to resume services under the Agreement until Client has paid all money previously due and owing by Client and a restart fee equal to ten percent (10%) of the balance remaining to be paid under this Agreement. KCI reserves the right to increase this restart fee if necessary to cover the additional expenses generated by starting the Work back up after it has been stopped.

## 13.  WARRANTY OF AUTHORITY TO SIGN
The individual signing this contract warrants that he/she has authority to sign as, or on behalf of, Client for whom or for whose benefit KCI's services are rendered. If such individual does not have such authority, he/she understands and agrees that he/she is personally responsible for this contract to KCI in addition to any liability which Client may have.

## 14.  NON-ALTERATION OF TERMS - WAIVER OF RIGHT
This Agreement and all the terms herein may only be amended, deleted, or otherwise altered by a written document signed by KCI and Client. Only an officer of KCI has authority to waive any matter or to amend the Agreement between KCI and Client.

The failure of KCI to enforce or act upon any right afforded it by this Agreement shall not be deemed a waiver of such right for future acts of a similar nature.

If any term or part hereof is held to be invalid by a Court of competent jurisdiction, that term or part thereof shall be deemed deleted and the remainder of this Agreement shall continue in full force and effect and be binding upon the Parties.

## 15.  THIRD PARTY BENEFICIARY
The Owner and Engineer agree that the services performed by the Engineer pursuant to this Agreement are solely for the benefit of the Owner and are not intended by either the Owner or the Engineer to benefit any other person or entity. To the extent that any other person or entity, including but not limited to the project contractor and/or any of its subcontractors, is benefited by the services performed by the Engineer pursuant to this Agreement, such benefit is purely incidental and such other person or entity shall not be deemed a third party beneficiary to this contract.

## 16.  ENTIRE AGREEMENT
These General Provisions, any drawings, plans, plats, and/or exhibits attached hereto, and the Proposal to which these items are attached, set forth the entire understanding and agreement between the parties with respect to the subject matter contained therein and shall be binding and inure (except as otherwise provided herein) to the benefit of the parties and their respective successors and assigns. This Agreement supersedes all prior documents, agreements, and understandings between the parties with respect to the transactions contemplated hereby specifically the State of Maryland, Prince George's County and the City of Laurel, MD.

## 17.  CONTROLLING LAW
This Agreement is to be governed by the law of the place of business of the KCI office submitting this proposal.



EXHIBIT B

## CORNER 1140
NOT TO SCALE



## CORNER 1141
NOT TO SCALE



SOUTH
OVER

I STREET

## CORNER 1143
NOT TO SCALE



## CORNER 1144
NOT TO SCALE



## OVERALL
NOT TO SCALE





DC SURVEYOR'S DATUM

BUILDING

GARAGE ENTRANCE

N89°59'58"W
23.25' (R) & (M)

N00°00'02"E

1142

LOT 46

N00°05'00"W   102.47' (M) 102.50' (R)

1144

1143

BUILDING OVERHANG

LOT 4

BRICK WALK

02"W   23.25' (R) & (M)

66.4' AGH

62.0' AGH

BUILDING

AVERAGE HEIGHT OF GARAGE CEILING = 8.28'

PLANTER

CONCRETE PAD



1154

EAST
OVERHANG

GRASS

BRICK WALK

# 16TH STREET



## OVERHANG EAST
NOT TO SCALE

## OVERHANG SOUTHWEST
NOT TO SCALE







84.04' (R)

PUBLIC ALLEY

60° 1140

LOT 43

S89°54'58"E   106.65' (M)   106.50' (R)

LOT "OF 5"

H.C.

BUILDING

COLUMN TYPICAL
TYPE



April 9, 2007

Being Lot 41 of Square 185 as recorded in the Office of the Surveyor for the District of Columbia, Washington, DC.

Beginning at a point said point being the Northwest corner of the intersection of I (EYE) Street and 16th Street North West. Thence running west with the North line of I (EYE) Street.

1. S89° 55' 02" W 83.25' feet (M) & (R) to a point marking the corner of Lot 41 and Lot 46 of Square 185. Thence running with the line of division between Lot 41 and Lot 46 of Square 185 the following two courses

2. N00° 05' 00" W 102.47' feet (M) 102.50 feet (R) to a point, thence running

3. N89° 59' 58" W 23.25' feet (M) & (R) to a point, said point also being common with a public alley. Thence running north with the East line of division for the variable width Public Alley and Lot 41,

4. N00° 00' 02" E 84.15' feet (M) 84.04' feet (R)  to a point marking the corner for the Public Alley, Lot 41 and Lot "Of 5", thence running East with the line of division between Lot 41 and the Lot "Of 5,"

5. S89° 59' 58" E 106.65' feet (M) 106.5 feet (R) to a point in the West line of 16th Street, thence running with the West line of 16th Street NW

6. S00° 00' 02" W 186.50' feet (M) 186.54 feet (R) to the point of beginning, containing 14517 square feet or 0.334 acres more or less.

Joseph H. Allegra L.S. 001866

| | REVISIONS | | |
|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY |
| 1 | 3/16/07 | INSERT LEGAL DESCRIPTION | |

ENGINEERS
PLANNERS
SCIENTISTS
CONSTRUCTION MANAGERS

# SURVEYOR'S CERTIFICATION

To: ICS 16th Street Associates, LLC, "Commonwealth Land Title Insurance Company", and to the lender, "The Christian Science Board of Directors of The First Church of Christ, Scientist, in Boston Massuchesetts".

This is to certify that this map or plat and the survey on which it is based were made in accordance with the "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," jointly established and adopted by ALTA and NSPS in 2005. Pursuant to the Accuracy Standards as adopted by ALTA and NSPS and in effect on the date of this certification, undersigned further certifies that in my professional opinion, as a Surveyor licenced in the District of Columbia, the Relative Positional Accuracy of this survey does not exceed that which is specified therein.

Joseph Harper Allegra,                                                    Date
District of Columbia Licenced Professional Land Surveyor LS 901866

# LEGEND

| | |
|---|---|
| PARKING STRIPE | |
| PROPERTY LINE | |
| BUILDING | |
| CONCRETE | |
| EDGE OF ROAD | |
| MINOR CONTOUR | |
| MAJOR CONTOUR | |
| GAS VALVE | |
| GAS METER | |
| WATER VALVE | |
| WATER METER | |
| SEWER MANHOLE | |
| STORM DRAIN MANHOLE | |
| STORM DRAIN STRUCTURE | |
| ELECTRIC MANHOLE | |

ITE
7/12/06
ALE
1" = 20'
ECKED BY

SQUARE 185   LOT 41

ALTA / ACSM LAND TITLE SURVEY

DRAWING NO.

AL



## VICINITY MAP

SCALE: 1" = 2000'

## SURVEYOR'S NOTES OF JULY 2006

1. This plat of survey represents a compilation of information obtained from (1) an on-the-ground instrument survey of the property, and (2) instruments and plats of public record.

2. Field work completed in July of 2006.

3. The allowable Relative Positional Accuracy for measurments controlling land boundaries on ALTA / ACSM Land Title Surveys is 0.07 feet (or 20 mm) + 50 PPM. This survey meets this requirement.

4. The orientation of the bearings shown on this plat is based on DC Surveyor's Datum.

5. The subject property lies within a Zone C, an "area of minimal flooding," as shown on a Federal Emergency Management Agency, Flood Insurance Rate Map, Community Panel Number 110010 0203, bearing an Effective Date of November 15, 1985.

6. There are 52 parking spaces on the site of which 1 is handicapped.

7. Area of subject property:
   Area as surveyed: 17,500.0 square feet = 0.40 acres

8. Area of building on property (area of footprint at grade level):
   4,707.14 square feet = 0.1081 acres

9. The locations shown for the entry/exit points for the various utilities serving the building are based on evidence as observed in the field and on plans approved by utility companies.

# SURVEYOR'S CERTIFICATION

To: ICG 16th Street Associates, LLC, "Commonwealth Land Title Insurance Company", and to the lender, "The Christian Science Board of Directors of The First Church of Christ, Scientist, in Boston Massuchesetts".

This is to certify that this map or plat and the survey on which it is based were made in accordance with the "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," jointly established and adopted by ALTA and NSPS in 2005. Pursuant to the Accuracy Standards as adopted by ALTA and NSPS and in effect on the date of this certification, undersigned further certifies that in my professional opinion, as a Surveyor licenced in the District of Columbia, the Relative Positional Accuracy of this survey does not exceed that which is specified therein.

Joseph Harper Allegra.                                                      Date
District of Columbia Licenced Professional Land Surveyor LS 901866

# LEGEND

| | |
|---|---|
| PARKING STRIPE | |
| PROPERTY LINE | |
| BUILDING | |
| CONCRETE | |
| EDGE OF ROAD | |
| MINOR CONTOUR | |
| MAJOR CONTOUR | |
| GAS VALVE | |
| GAS METER | |
| WATER VALVE | |
| WATER METER | |
| SEWER MANHOLE | |
| STORM DRAIN MANHOLE | |
| STORM DRAIN STRUCTURE | |
| ELECTRIC MANHOLE | |

SQUARE 185   LOT 41

ALTA / ACSM LAND TITLE SURVEY

DRAWING NO.

# OWNER'S POLICY OF TITLE INSURANCE

Issued by **Commonwealth Land Title Insurance Company**

**EXHIBIT C**

 **LandAmerica Commonwealth**

*Commonwealth Land Title Insurance Company is a member of the LandAmerica family of title insurance underwriters.*

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, COMMONWEALTH LAND TITLE INSURANCE COMPANY, a Nebraska corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title;
4. Lack of a right of access to and from the land.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title, as insured, but only to the extent provided in the Conditions and Stipulations.

IN WITNESS WHEREOF, COMMONWEALTH LAND TITLE INSURANCE COMPANY has caused its corporate name and seal to be hereunto affixed by its duly authorized officers, the Policy to become valid when countersigned by an authorized officer or agent of the Company.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Attest:

_(signature)_
Secretary

_(seal: COMMONWEALTH LAND TITLE INSURANCE COMPANY — SEAL — NEBRASKA)_

By: _Theodore L. Chandler_
President

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.

4. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (a) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or
   (b) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:
       (i) to timely record the instrument of transfer; or
       (ii) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

CONDITIONS AND STIPULATIONS

**1. DEFINITION OF TERMS.**

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A, and, subject to any rights or defenses the Company would have had against the named insured, those who succeed to the interest of the named insured by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devisees, survivors, personal representatives, next of kin, or corporate or fiduciary successors.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge. With respect to Section 1(a)(iv) of the Exclusions From Coverage, "public records" shall also include environmental protection liens filed in the records of the clerk of the United States district court for the district in which the land is located.

(g) "unmarketability of the title": an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

**2. CONTINUATION OF INSURANCE AFTER CONVEYANCE OF TITLE.**

The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

**3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.**

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

**4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE.**

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

**5. PROOF OF LOSS OR DAMAGE.**

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph shall terminate any liability of the Company under this policy as to that claim.

**6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.**

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance.

To pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay.

Upon the exercise by the Company of this option, all liability and obligations to the insured under this policy, other than to make the payment required, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs (b)(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

Conditions and Stipulations Continued Inside Cover

CONTROL NO.:   206-1063009.

File No. 06-001361
Commercial Connection No. 10866450

Policy No. 

## COMMONWEALTH LAND TITLE INSURANCE COMPANY
## OWNER'S POLICY OF TITLE INSURANCE

### SCHEDULE A

Amount of Insurance:   $9,000,000.00

Date of Policy:        April 12, 2007 @ 3:27 P.M.

1.    Name of Insured:

      ICG 16th Street Associates, LLC, a Delaware limited liability company

2.    The estate or interest in the land described or referred to herein is:

      FEE SIMPLE

3.    Title to the estate or interest in the land is vested in:

      ICG 16th Street Associates, LLC, a Delaware limited liability company, by virtue of
      Special Warranty Deed dated as of April 12, 2007 and recorded April 12, 2007 as
      Instrument No. 2007050783.

4.    The land referred to in this policy is described as follows:

                              See attached Exhibit "A"

Countersigned:          _____

                              Sarah Eckert Webb
                        Authorized Officer or Authorized Signatory

                   *Valid Only If Schedule B and Cover Are Attached*

ALTA Owner's Policy (10/17/92)

File No. 06-001361                                    Policy No. 

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorney's fees or expenses) which arise by reason of:

1.  Real Estate Taxes, including Golden Triangle Business Improvement District (Golden Triangle BID) taxes, subsequent to March 31, 2007, a lien not yet due and payable.

2.  Public Space Vault Rent subsequent to June 30, 2006, a lien not yet due and payable.

3.  Agreement relating to the Occupation of Sub-surface Public Space (Vaults) dated November 10, 1969 and recorded November 25, 1969 as Instrument No. 23958 in Liber 13054 at folio 582, as show on plat of a survey made by KCI Technologies, dated July 12, 2006, and last revised April 10, 2007, designated as KCI Job No. 1606503901 (the "Survey").

4.  Memorandum of Lease by and between ICG 16th Street Associates, LLC ("Landlord") and Third Church of Christ, Scientist, Washington, D.C. ("Tenant") dated as of April 12, 2007 and recorded April 12, 2007 as Instrument No. 2007050785.

5.  Declaration of Covenants and Easements recorded April 12, 2007 as Instrument No. 2007050786.

6.  Purchase-Money Deed of Trust, Assignment of Rents and Security Agreement made from ICG 16th Street Associates, LLC, a Delaware limited liability company, to Richard F. Judkins and Kevin E. Ness, Trustees, dated as of April 12, 2007 and recorded April 12, 2007 as Instrument No. 2007050784, securing The Christian Science Board of Directors of The First Church of Christ, Scientist, in Boston, Massachusetts, a body corporate in accordance with the laws of the Commonwealth of Massachusetts in the original principal amount of $7,000,000.00.

7.  The Survey also discloses the following:
    a.  Projection of southwest overhang into public space (I Street, N.W.).
    b.  Projection of overhanging bell tower into public space (16th Street, N.W.).
    c.  Projection of underground parking spaces into Sub-surface Public Space.

(End of Schedule B)

## EXHIBIT "A"

All that certain lot or parcel of land together with all improvements thereon located and being in the City of Washington in the District of Columbia and being more particularly described as follows:

Lot numbered Forty-one (41) in Square numbered One Hundred Eighty-five (185) in the subdivision made by The Christian Science Board of Directors of The First Church of Christ, Scientist in Boston Massachusetts, as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 154 at folio 45.

NOTE: The above lot being more particularly described as follows:

Beginning at a point said point being the Northwest corner of the intersection of I (EYE) Street and 16th Street North West. Thence running west with the North line of I (EYE) Street.

1.  S89° 55' 02" W 83.25 feet (M) & (R) to a point marking the corner of Lot 41 and Lot 46 of Square 185. Thence running with the line of division between Lot 41 and Lot 46 of Square 185 the following two courses

2.  N00° 05' 00" W 102.47 feet (M) 102.50 feet (R) to a point, thence running

3.  N89° 59' 58" W 23.25 feet (M) & (R) to a point, said point also being common with a public alley. Thence running north with the East line of division for the variable width Public Alley and Lot 41,

4.  N00° 00' 02" E 84.15 feet (M) 84.04 feet (R) to a point marking the corner for the Public Alley, Lot 41 and Lot "Of 5", thence running East with the line of division between Lot 41 and the Lot "Of 5",

5.  S89° 59' 58" E 106.65 feet (M) 106.50 feet (R) to a point in the West line of 16th Street, thence running with the West line of 16th Street

6.  S00° 00' 02" W 186.50 feet (M) 186.54 feet (R) to the point of beginning, containing 14517 square feet or 0.334 acres more or less.



ISSUED BY
COMMONWEALTH LAND TITLE INSURANCE COMPANY

**ALTA 9.2 (RESTRICTIONS, ENCROACHMENTS AND MINERAL) ENDORSEMENT**



Commonwealth
A LANDAMERICA COMPANY

File No. 06-001361

To be annexed to and form a part of Policy No. 

as set forth in said Policy.

The said Policy is hereby amended in the following manner:

The Company insures the insured against loss or damage sustained by reason of:

1.     The existence, at Date of Policy, of any of the following unless expressly excepted in Schedule B:

   (a)  Present violations on the land of any enforceable covenants, conditions or restrictions, or any existing improvements on the land which violate any building setback lines shown on a plat of subdivision recorded or filed in the public records.

   (b)  Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land which in addition, (i) establishes an easement on land; (ii) provides for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant; or (iii) provides a right of reentry, possibility or reverter or right of forfeiture because of violations on the land of any enforceable covenants, conditions or restrictions.

   (c)  Any encroachment of existing improvements located on the land onto adjoining land, or any encroachment onto the land of existing improvements located on adjoining land.

-- continued --

The total liability of the Company under said policy and any endorsements attached thereto shall not exceed, in the aggregate, the face amount of said policy and costs which the Company is obligated under the provisions of said policy to pay.

This endorsement is made a part of said policy and is subject to the exclusions, schedules, endorsements, conditions, stipulations and terms thereof, except as modified by the provisions hereof.

Nothing herein contained shall be construed as extending or changing the effective date of said Policy, unless otherwise expressly stated.

IN WITNESS WHEREOF, COMMONWEALTH LAND TITLE INSURANCE COMPANY has caused its corporate name and seal to be hereunto affixed by its duly authorized officers.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Dated:  April 12, 2007

Countersigned:

By _____
       Sarah Eckert Webb
      Authorized Signatory

By: _Janet A. Alpert_
                              President

Attest: _Wm. Chadwick Perrine_
                              Secretary

Form 1013

Policy Number (██████)
ALTA 9.2 (Restrictions, Encroachments and Mineral) Endorsement
Page Two (2)

    (d) Any encroachment of existing improvements located on the land onto that portion of the land subject to any easement excepted in Schedule B.

    (e) Any notices of violation of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records.

2.    Damage to existing buildings:

    (a) Which are located on or encroach upon that portion of the land subject to any easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved;

    (b) Resulting from the future exercise of any right existing at Date of Policy to use the surface of the land for the extraction or development of minerals excepted from the description of the land or excepted in Schedule B.

3.    Any final court order or judgment requiring the removal from any land adjoining the land of any encroachment, other than fences, landscaping or driveways, excepted in Schedule B.

4.    Any final court order or judgment denying the right to maintain any existing building on the land because of any violation of covenants, conditions or restrictions or building setback lines shown on plat of subdivision recorded or filed in the public records.

Wherever in this endorsement the words "covenants, conditions, or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or limitations contained in an instrument creating a lease.

As used in paragraph 1(a) and 4, the words "covenants, conditions, or restrictions shall not be deemed to refer to or include any covenants, conditions or restrictions relating to environmental protection.

H:\CSI and NCS Forms\Endorsements\Commonwealth\CURRENT ALTA (7-24-01) ENDS\ALTA 9.2.doc

ISSUED BY
COMMONWEALTH LAND TITLE INSURANCE COMPANY                      SAME AS SURVEY ENDORSEMENT



## Commonwealth
A LANDAMERICA COMPANY

File No. 06-001361

To be annexed to and form a part of Policy No. 

as set forth in said Policy.
The said Policy is hereby amended in the following manner:

The Company hereby affirmatively insures that the land described in Schedule A hereto is the same as that delineated on the plat of a survey made by KCI Technologies, dated July 12, 2006, and last revised April 10, 2007, designated as KCI Job No. 1606503901.

The total liability of the Company under said policy and any endorsements attached thereto shall not exceed, in the aggregate, the face amount of said policy and costs which the Company is obligated under the provisions of said policy to pay.

This endorsement is made a part of said policy and is subject to the exclusions, schedules, endorsements, conditions, stipulations and terms thereof, except as modified by the provisions hereof.

Nothing herein contained shall be construed as extending or changing the effective date of said Policy, unless otherwise expressly stated.

IN WITNESS WHEREOF, COMMONWEALTH LAND TITLE INSURANCE COMPANY has caused its corporate name and seal to be hereunto affixed by its duly authorized officers.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Dated: April 12, 2007

Countersigned:                                                By: _Janet A. Alpert_
                                                                              President

By _____                     Attest: _Wm. Chadwick Perine_
        Sarah Eckert Webb                                                      Secretary
        Authorized Signatory

Form 1013
H:\washington-nca\csl_forms\endorsements\Commonwealth\Same as Survey.doc

ISSUED BY
COMMONWEALTH LAND TITLE INSURANCE COMPANY                    SEPARATE TAX LOT ENDORSEMENT



# Commonwealth
A LANDAMERICA COMPANY

File No. 06-001361

To be annexed to and form a part of Policy No. 

as set forth in said Policy.
The said Policy is hereby amended in the following manner:

The Company hereby insures the Insured against loss or damage which the Insured shall sustain by reason of the failure of the land referred to in Schedule A hereof to constitute a separate tax parcel for real estate tax assessment purposes.

The total liability of the Company under said policy and any endorsements attached thereto shall not exceed, in the aggregate, the face amount of said policy and costs which the Company is obligated under the provisions of said policy to pay.

This endorsement is made a part of said policy and is subject to the exclusions, schedules, endorsements, conditions, stipulations and terms thereof, except as modified by the provisions hereof.

Nothing herein contained shall be construed as extending or changing the effective date of said Policy, unless otherwise expressly stated.

IN WITNESS WHEREOF, COMMONWEALTH LAND TITLE INSURANCE COMPANY has caused its corporate name and seal to be hereunto affixed by its duly authorized officers.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Dated: April 12, 2007

Countersigned:

By: *Janet A. Alpert*
President

Attest: *Wm. Chadwick Perrine*
Secretary

By _____
Sarah Eckert Webb
Authorized Signatory

Form 1013
H:\washington-ncs\csl_forms\endorsements\Commonwealth\Separate Tax Lot.doc

ISSUED BY
COMMONWEALTH LAND TITLE INSURANCE COMPANY

STREET ACCESS ENDORSEMENT



## Commonwealth
A LANDAMERICA COMPANY

File No. 06-001361

To be annexed to and form a part of Policy No.     ----

as set forth in said Policy.
The said Policy is hereby amended in the following manner:

The subject property abuts upon and has direct access to (a) physically open and duly dedicated public street(s) known as 16th Street, N.W., and I Street, N.W.

The total liability of the Company under said policy and any endorsements attached thereto shall not exceed, in the aggregate, the face amount of said policy and costs which the Company is obligated under the provisions of said policy to pay.

This endorsement is made a part of said policy and is subject to the exclusions, schedules, endorsements, conditions, stipulations and terms thereof, except as modified by the provisions hereof.

Nothing herein contained shall be construed as extending or changing the effective date of said Policy, unless otherwise expressly stated.

IN WITNESS WHEREOF, COMMONWEALTH LAND TITLE INSURANCE COMPANY has caused its corporate name and seal to be hereunto affixed by its duly authorized officers.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Dated:  April 12, 2007

Countersigned:

By _____
Sarah Eckert Webb
Authorized Signatory

By: _Janet A. Alpert_
President

Attest: _Wm. Chadwick Perrine_
Secretary

Form 1013
H:\\washington-ncs\csl_forms\endorsements\Commonwealth\Street Access.doc

CONDITIONS AND STIPULATIONS
(Continued)

**7.   DETERMINATION, EXTENT OF LIABILITY AND COINSURANCE.**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a)   The liability of the Company under this policy shall not exceed the least of:

(i)   the Amount of Insurance stated in Schedule A; or,

(ii)   the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b)   In the event the Amount of Insurance stated in Schedule A at the Date of Policy is less than 80 percent of the value of the insured estate or interest or the full consideration paid for the land, whichever is less, or if subsequent to the Date of Policy an improvement is erected on the land which increases the value of the insured estate or interest by at least 20 percent over the Amount of Insurance stated in Schedule A, then this Policy is subject to the following:

(i)   where no subsequent improvement has been made, as to any partial loss, the Company shall only pay the loss pro rata in the proportion that the amount of insurance at Date of Policy bears to the total value of the insured estate or interest at Date of Policy; or

(ii)   where a subsequent improvement has been made, as to any partial loss, the Company shall only pay the loss pro rata in the proportion that 120 percent of the Amount of Insurance stated in Schedule A bears to the sum of the Amount of Insurance stated in Schedule A and the amount expended for the improvement.

The provisions of this paragraph shall not apply to costs, attorneys' fees and expenses for which the Company is liable under this policy, and shall only apply to that portion of any loss which exceeds, in the aggregate, 10 percent of the Amount of Insurance stated in Schedule A.

(c)   The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

**8.   APPORTIONMENT.**

If the land described in Schedule A consists of two or more parcels which are not used as a single site, and a loss is established affecting one or more of the parcels but not all, the loss shall be computed and settled on a pro rata basis as if the amount of insurance under this policy was divided pro rata as to the value on Date of Policy of each separate parcel to the whole, exclusive of any improvements made subsequent to Date of Policy, unless a liability or value has otherwise been agreed upon as to each parcel by the Company and the insured at the time of the issuance of this policy and shown by an express statement or by an endorsement attached to this policy.

**9.   LIMITATION OF LIABILITY.**

(a)   If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b)   In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title as insured.

(c)   The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company.

**10.   REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.**

All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto.

**11.   LIABILITY NONCUMULATIVE.**

It is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the insured has agreed, assumed, or taken subject, or which is hereafter executed by an insured and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy to the insured owner.

**12.   PAYMENT OF LOSS.**

(a)   No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b)   When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

**13.   SUBROGATION UPON PAYMENT OR SETTLEMENT.**

(a)   The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to these rights and remedies in the proportion which the Company's payment bears to the whole amount of the loss.

If loss should result from any act of the insured claimant, as stated above, that act shall not void this policy, but the Company, in that event, shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

(b)   The Company's Rights Against Non-insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by reason of this policy.

**14.   ARBITRATION.**

Unless prohibited by applicable law, either the Company or the insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the insured. All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

**15.   LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.**

(a)   This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b)   Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c)   No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

**16.   SEVERABILITY.**

In the event any provision of the policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

**17.   NOTICES WHERE SENT.**

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to: Consumer Affairs Department, P.O. Box 27587, Richmond, Virginia 23261-7587.

# OWNER'S POLICY OF TITLE INSURANCE

American Land Title Association (10/17/92)

Issued by

## Commonwealth Land Title Insurance Company

Commonwealth Land Title Insurance Company
is a member of the LandAmerica family of title insurance
underwriters.



**LandAmerica**
**Commonwealth**

LandAmerica Financial Group, Inc.
5600 Cox Road
Glen Allen, Virginia 23060-9266
www.landam.com

Form B 1190-1B

---

## THANK YOU.

Title insurance provides for the protection of your real estate investment. We suggest you keep this policy in a safe place where it can be readily available for future reference.

If you have questions about title insurance or the coverage provided by this policy, contact the office that issued this policy, or you may call or write:

Commonwealth Land Title Insurance Company
Consumer Affairs
P.O. Box 27567
Richmond, Virginia 23261-7567
*telephone, toll free:* 800 446-7086
*web:* www.landam.com

We thank you for choosing to do business with Commonwealth Land Title Insurance Company, and look forward to meeting your future title insurance needs.

Commonwealth Land Title Insurance Company
is a member of the LandAmerica family of title insurance
underwriters.



**LandAmerica**
**Commonwealth**



EXHIBIT

D

## PROFESSIONAL SERVICES AGREEMENT

THIS PROFESSIONAL SERVICES AGREEMENT (with all exhibits attached hereto, this "Agreement") is made as of the 22nd day of February, 2013 by and between ICG 16TH STREET ASSOCIATES, L.L.C. ("Owner") and WILES MENSCH CORPORATION ("Consultant") for surveying and civil engineering services in connection with Owner's office and church development project to be located at 900 16th Street, NW, Washington, DC (the "Project").

Owner and Consultant, in consideration of their mutual covenants set forth herein, agree as follows:

SECTION 1 - Consultant's Status and Standard of Care.

Consultant acknowledges that it is an independent contractor and that it is not the representative or agent of Owner. Consultant agrees to perform its Services (as defined below) in the best and most sound way and in the most expeditious and economical manner consistent with the interests of Owner, it being specifically understood that Consultant shall perform all Services required to be performed hereunder in accordance with generally accepted professional standards and practices for projects of similar scope and complexity.

SECTION 2 - Scope of Basic Services, and Duties and Responsibilities of Consultant.

For the compensation set forth in SECTION 4.A, Consultant shall perform the Basic Services and assume the duties and responsibilities set forth in this SECTION 2.

A.   Basic Services.

For each task listed in the attached Exhibit A (each a "Task," and collectively the "Tasks") Consultant shall perform all of the services that are described in the attached Exhibit A and the services reasonably inferable therefrom (the "Basic Services"). Owner and Consultant acknowledge and agree that this Agreement shall govern all Services performed hereunder, whether such Services are performed before, on, or after the date of this Agreement or the parties' execution of this Agreement.

B.   Duties and Responsibilities of Consultant.

The duties and responsibilities of Consultant in performing the Basic Services are set forth below:

1.   Qualifications and Staffing.

Consultant represents and acknowledges that it is knowledgeable of all codes, rules and regulations applicable to the Project and the Services that Consultant is performing in the jurisdiction in which the Project is located, and by this representation Consultant agrees to comply with these codes, rules and regulations. Consultant shall take all steps necessary to ensure that the Project is subject to the currently applicable District of Columbia Department of the Environment's storm-water management requirements (the "SWM Regulations") as of the date of this Agreement. If for any reason the Project is required to adhere to newly adopted SWM Regulations that are more stringent than the currently applicable SWM Regulations, Consultant shall ensure that the Basic Services shall be performed in compliance with the more stringent requirements. Should Consultant fail to comply with the

403962338v2

EXHIBIT
E

applicable SWM Regulations, codes, rules and regulations, Consultant hereby agrees to bear all costs incurred in securing compliance with such SWM Regulations, codes, rules or regulations.

Consultant represents that it is experienced and fully qualified to perform the Services contemplated by this Agreement, that it is properly licensed pursuant to applicable law to perform such Services, and that the documents that Consultant produces will be sealed and certified by qualified, licensed and registered design professionals or engineers, if required by the appropriate governmental agencies.

All staff used by Consultant in the performance of the Basic Services shall be qualified by training and experience to perform their assigned tasks. Although Consultant may assign qualified personnel of its choosing to the Project, Owner may direct Consultant to remove any of Consultant's personnel whom Owner deems unsuitable in qualifications, performance, or conduct, and Owner shall have the right to approve all replacements.

2.      Time of Performance.

Consultant shall perform each Task in accordance with the schedule attached hereto as Exhibit B and, for those items not on the schedule, expeditiously and in such a manner so as not to delay the completion of the Project design and construction. Failure to conform to the foregoing (and any extensions approved by Owner in writing) shall be a material breach of this Agreement, unless such failure is due to causes beyond the control of Consultant, a Subconsultant, or anyone for whom either may be responsible.

3.      Permits and Regulations.

Consultant shall assist Owner in obtaining any authorizations or permits related to the performance of Consultant's Services and required to be obtained from any governmental authority.

4.      Responsibility for Subconsultants.

(a)      Selection and Retention of Subconsultants. Consultant, with Owner's approval, may retain from time to time "Subconsultants" as may be necessary to accomplish the Basic Services. Prior to the award of any Subconsultant subcontract, Consultant shall consult with Owner and shall submit the name of the proposed Subconsultant to Owner. Owner reserves the right to reject any proposed Subconsultant for any reason. Conformed copies of executed Subconsultant subcontracts shall be provided to Owner upon request.

Consultant shall bind each and every Subconsultant to the terms stated herein and shall ensure that all persons rendering services under this Agreement are properly licensed to provide such services in the locale in which the Project is located, if required by the appropriate governmental agencies.

Consultant hereby affirms that it will be fully responsible for the errors, omissions and negligent acts of its Subconsultants.

(b)      Compensation of Subconsultants. Consultant shall be responsible for, and the Basic Compensation (hereinafter defined) includes, all costs for the services of Consultant and all Subconsultants retained by Consultant as may be necessary to accomplish the Basic Services described herein.

2

(c)     Payments to Subconsultants. Consultant agrees to pay its Subconsultants within five (5) days after Consultant receives payment from Owner. In the event Owner is advised that Consultant has failed to pay any Subconsultant as required above, Consultant agrees that Owner may make all future payments directly to such Subconsultant or by check payable jointly to the Subconsultant and Consultant, and Owner may withhold from subsequent payments to Consultant any amounts that Owner paid or intends to so pay to such Subconsultant because Consultant did not pay such Subconsultant as required above. The making of any payments by Owner to Subconsultants shall not give rise to any liability by Owner for making such payments or to any obligation on Owner's part to make such payments, and shall not create any contractual relationship between Owner and such Subconsultants. Payments to Consultant and/or to Subconsultants shall not constitute an acceptance of the adequacy of any Services performed by Consultant or its Subconsultants.

5.     Coordination.

Consultant shall coordinate its Services with the services of all Subconsultants, the architect, other consultants retained by Owner, other design professionals, contractors and Owner.

SECTION 3 - Additional Services.

Consultant shall provide "Additional Services" (defined as services not included in the Basic Services) upon Owner's request. Before performing any Additional Services, Consultant shall obtain Owner's written approval of the scope, not-to-exceed amount, and schedule for such Additional Services. Basic Services, changes thereto, and Additional Services may be referred to together herein as "Services."

SECTION 4 - Compensation.

A.     Basic Services, Duties and Responsibilities.

For the Basic Services and for the duties and responsibilities set forth in SECTION 2, Consultant shall receive compensation for each Task on a lump sum basis per the Fee Schedule attached as Exhibit C hereto (the "Basic Compensation"). Payments on account of Basic Services shall be made monthly and shall be in proportion to the Basic Services performed for each Task.

B.     Additional Services.

Owner shall pay amounts due for Additional Services, if any, on an hourly-rate basis for each hour reasonably and necessarily incurred in performing the Additional Services per the rates set forth in Exhibit C hereto or, if the parties so agree in writing, on a lump sum basis.

C.     Reimbursable Expenses.

"Reimbursable Expenses" are in addition to the compensation for Basic and Additional Services and include actual, reasonable expenditures made by Consultant in the interest of the Project for the categories of expenses listed in Exhibit D attached hereto, if any. The Reimbursable Expenses shall not be subject to mark-up. Owner shall pay amounts due for Reimbursable Expenses in response to invoices submitted not more often than once per month.

3

D.   Payment.

Owner will pay all undisputed amounts due to Consultant for Basic Services and Additional Services within thirty (30) days after Owner's receipt of Consultant's invoice, such supporting documentation as Owner may reasonably request, and enforceable waivers of liens and claims from Consultant and each Subconsultant in forms reasonably acceptable to Owner.

SECTION 5 - Owner's Participation.

Consultant understands and agrees that Owner may, through its designated representative or representatives, actively participate in the Project. Owner's participation, through its representatives, shall in no way relieve Consultant of its professional duties and responsibilities under applicable law or this Agreement.

SECTION 6 - Ownership of Documents.

All drawings, specifications, reports, plats and other documents or work product prepared by Consultant or its Subconsultants pursuant to this Agreement, including all intellectual property rights thereto ("Documents"), are deemed by the parties to be "works made for hire" under the U.S. copyright laws and are and shall remain the sole and exclusive property of Owner, regardless of whether the Project is completed or not. If, for any reason, any copyrightable Documents are deemed not to be a "work made for hire" by a court of competent jurisdiction, then Consultant does hereby irrevocably transfer, grant and assign to Owner all worldwide right, title and interest in and to the Documents, including without limitation all Intellectual Property and ownership Rights. Upon termination of this Agreement by Owner pursuant to SECTION 9, upon completion of the Services, or at any time upon Owner's request, Consultant shall deliver all Documents to Owner, and Consultant may retain a set for its records, and for no other purpose. Consultant shall include a similar provision in its agreements with its Subconsultants. Owner may use the Documents for the Project, additions to the Project, maintenance, or for any other purpose, and Consultant agrees to the use and modification of the Documents by other design professionals. Nevertheless, it is understood by Owner that the Documents may be inappropriate for use in connection with any other project. Therefore, Consultant shall not be responsible for the use of such Documents in connection with any project other than the Project for which they were specifically prepared. This provision shall survive the completion of the Services, final payment, or earlier termination of this Agreement.

SECTION 7 - Insurance Policies.

Consultant shall secure and maintain in force the policies of insurance identified below.

A.   Commercial General Liability Insurance.

Commercial general liability insurance on a form at least as broad as Insurance Services Office ("ISO") commercial general liability coverage "occurrence" form CG 00 01 10 01, or another ISO commercial general liability "occurrence" form providing equivalent coverage and approved in writing by Owner, providing broad form commercial general liability coverage, blanket contractual liability coverage, coverage for bodily injury (including death), property damage (including loss of use thereof), products and completed operations, with limits of liability coverages in no less than the following amounts:

4

$2,000,000   general aggregate (other than products-completed operations)
$2,000,000   products-completed operations aggregate limit
$1,000,000   personal and advertising injury limit
$1,000,000   per occurrence limit
$  100,000   fire damage limit (any one fire)
$    5,000   medical expense limit (any one person)

B.    Motor Vehicle Liability Insurance.

Motor vehicle liability insurance issued on a form at least as broad as ISO business auto coverage form CA 00 01 07 97, or other form providing equivalent coverage, approved by Owner in writing, covering all owned, hired, borrowed and non-owned vehicles (Symbol 1) brought onto Owner's premises, with limits of liability coverage of not less than $1,000,000 per accident combined single limit for bodily injury and property damage.

C.    Workers' Compensation and Employers' Liability Insurance.

Workers' compensation insurance as required by statute. Employers' liability (or, in a monopolistic state, stop gap liability) insurance with limits of liability coverage of not less than $500,000 each accident, $500,000 each employee-disease, and $500,000 policy limit-disease. Consultant hereby waives all rights of recovery against Owner and the other Indemnified Parties (as defined below) arising out of claims made under the workers' compensation or employers' liability insurance required to be maintained under this Agreement, and all such insurance shall include, by endorsement or otherwise, a waiver of subrogation in favor of Owner and the other Indemnified Parties.

D.    Excess or Umbrella Liability Insurance.

Excess or umbrella liability insurance on a follow-form basis with respect to the insurance required pursuant to Paragraphs A, B and C above, in an amount of not less than $4,000,000 per occurrence and otherwise satisfying the requirements set forth in Paragraphs A, B and C above.

E.    Professional Liability Insurance.

Professional liability insurance written on a policy form specifically designed to protect against acts, errors or omissions in the rendering of professional services by Consultant as defined in the policy, which must specifically include Services performed under this Agreement. Policy limits shall be no less than $2,000,000 per claim and annual aggregate. If such insurance is written on a claims-made basis, Consultant will maintain and keep in force and effect such insurance for seven (7) years after the later of the completion of the Services, final payment, or earlier termination of this Agreement.

F.    Additional Requirements.

Consultant agrees to maintain and keep in full force and effect the insurance policies outlined in Paragraphs A, B and D above for a minimum of three (3) years after the later of the completion of the Services, final payment, or earlier termination of this Agreement. All insurance policies required above will be issued by insurers with AM Best Insurance Guide ratings of at least A- VII or better. Consultant shall name Owner, JBG Properties, Inc., JBG/Development Group, L.L.C., and Owner's landlord (if any), tenant(s) (if any), lender(s) (if

5

any), and such other persons or entities designated by Owner as additional insureds for all coverages except workers' compensation and professional liability (Paragraphs C and E). Coverage for the additional insureds shall be primary, and non-contributory with any other insurance coverage any additional insured may have. The coverage for the additional insureds shall be as broad as the coverage afforded Consultant under its policies of insurance. Prior to commencing its Services, Consultant shall provide Owner with Certificate(s) of Insurance and copies of any applicable endorsements evidencing the above insurance policies and the additional insureds' status. If requested by Owner, Consultant shall provide Owner with complete copies of the policies required to be maintained hereunder, including any applicable endorsements. Consultant shall notify Owner in writing immediately if Consultant's insurance coverage is terminated or modified for any reason. The issuance or maintenance of insurance of any type by Consultant will not be deemed or construed to release, limit, waive, or discharge Consultant from any of the obligations and risks imposed by this Agreement or applicable law upon Consultant. Neither failure by Owner to require proof of insurance from Consultant nor the contents of a certificate of insurance provided by Consultant shall be deemed a waiver of Owner's or any other additional insured's rights or Consultant's obligations regarding the provision of insurance under this Agreement.

To the extent of actual recovery of insurance proceeds received on account of a direct physical loss covered by builder's risk property insurance during construction, Owner and Consultant waive all rights against each other and against the contractors, consultants, agents and employees of the other for such proceeds, except such rights as they may have to the proceeds of such insurance. Consultant shall require of its Subconsultants, agents and employees of any of them similar waivers in favor of the parties enumerated herein.

SECTION 8 - Indemnification.

Consultant shall indemnify and hold harmless Owner and JBG/Development Group, L.L.C. and their respective officers, directors, members, principals, affiliates, and employees (the "Indemnified Parties") from any and all liability, damages, injuries, losses, costs, and expenses, including but not limited to reasonable attorneys' fees (together, "Claims," and each, a "Claim"), but only to the extent caused by the negligence, recklessness or intentional wrongful misconduct of Consultant, Subconsultants, and other persons employed or utilized by Consultant in the performance of this Project, whether or not the Claim was caused in part by an Indemnified Party. This provision shall survive the completion of the Services, final payment, or earlier termination of this Agreement.

SECTION 9 - Termination and Suspension.

    A.    Termination by Owner.

        1.    Termination for Owner's Convenience.

Owner shall have the right to terminate this Agreement at any time without cause, such termination being effected by a written notice from Owner to Consultant and to be effective on the date set forth in said notice, but in any event not more than three (3) days after the date of delivery of such notice to Consultant. In the event that Owner terminates this Agreement as set forth herein, Consultant shall immediately turn over to Owner any and all Documents and other property produced or in the possession of Consultant relating to the

6

Services. Owner shall then pay to Consultant all amounts due pursuant to SECTION 4 through the termination date.

    2.    <u>Termination for Default</u>.

        If Consultant fails to perform in accordance with the terms of this Agreement, then Owner may, without prejudice to any other right or remedy that Owner may have and after giving Consultant ten (10) days written notice (unless Consultant cures its failure to perform within such ten-day period), terminate this Agreement and take possession of all work performed hereunder by Consultant and perform the Services by whatever method Owner may deem expedient. However, if an emergency exists relating to the default, the termination shall be effective upon receipt of the written notice, and Consultant shall not be entitled to attempt to cure its failure to perform. In the event of a termination, Consultant shall immediately turn over to Owner any and all Documents and other property produced by or in the possession of Consultant relating to the Services, and Consultant shall not be entitled to receive any further payment.

    B.    <u>Suspension by Owner</u>.

        Owner reserves the right to suspend performance of the Services. If performance of the Services is suspended by Owner for any reason beyond Consultant's control, Owner shall compensate Consultant for all Services performed prior to such suspension in accordance with the terms of this Agreement, and if the Project is resumed, Consultant's compensation and time for performance shall be equitably adjusted.

    C.    <u>Termination by Consultant</u>.

        Failure by Owner to make payments to Consultant in accordance with this Agreement shall be considered substantial nonperformance and cause for termination if Owner does not make payment of undisputed amounts within fifteen (15) days after receipt of written notice from Consultant that the payment is overdue. In case of termination, but only after delivery to Owner of the Documents, Consultant shall be entitled to receive payment for tasks actually completed and Reimbursable Expenses actually incurred up to the date of termination, but such payments shall be Consultant's sole remedy in the event of termination.

<u>SECTION 10 - Dispute Resolution</u>.

    A.    Any disputes arising in connection with the interpretation of, or performance of any obligation under, this Agreement shall be resolved by litigation in the state or federal courts located in the jurisdiction in which the Project is located.

    B.    OWNER AND CONSULTANT SPECIFICALLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY COURT WITH RESPECT TO ANY CONTRACTUAL, TORTIOUS OR STATUTORY CLAIM, COUNTERCLAIM OR CROSS-CLAIM AGAINST THE OTHER ARISING OUT OF OR CONNECTED IN ANY WAY TO THE PROJECT OR THIS AGREEMENT BECAUSE THE PARTIES HERETO, BOTH OF WHOM ARE REPRESENTED BY COUNSEL, BELIEVE THAT THE COMPLEX COMMERCIAL AND PROFESSIONAL ASPECTS OF THEIR DEALINGS WITH ONE ANOTHER MAKE A JURY DETERMINATION NEITHER DESIRABLE NOR APPROPRIATE.

C.     Pending resolution of any dispute, Consultant shall continue to perform its obligations under this Agreement so as not to delay the Project, and Owner shall continue to pay amounts not in dispute.

SECTION 11 - Miscellaneous Provisions.

A.     Applicable Law.

This Agreement shall be construed in accordance with the laws of the jurisdiction in which the Project is located, without reference to its choice of law provisions.

B.     Assignment.

Owner may assign or novate all or a portion of its rights under this Agreement to lenders, entities affiliated with Owner or JBG Properties, Inc., and certain persons or entities financially able to pay amounts due under this Agreement. In the event of such assignment or novation, this Agreement shall remain fully binding upon Consultant to the full extent as if executed initially with the assignee or novatee. Consultant may not assign this Agreement or any of its obligations to perform under this Agreement without the express written consent of Owner, nor may Consultant assign its rights to payment without Owner's express written consent.

C.     Contract Modifications and Waivers.

No waiver, alteration, amendment, or modification of any of the provisions of this Agreement shall be binding upon either Owner or Consultant unless the same shall be in writing and signed by both Owner and Consultant. No action or failure to act by Owner shall constitute a waiver of a right or duty afforded it under this Agreement, nor shall such action or failure to act constitute approval of or acquiescence in a breach of this Agreement, except as may be specifically agreed in writing by Owner. Failure by Owner to terminate this Agreement on account of any breach shall not be deemed to be a waiver of such breach and shall not affect Owner's right to recover damages in connection with such breach.

D.     Accounting Records.

Consultant shall maintain accounting records for all Services performed under this Agreement. Consultant shall also maintain detailed time records for all personnel whose time is charged to Owner under this Agreement and shall obtain and maintain receipts for all Reimbursable Expenses. Owner shall be afforded access to all such records at all reasonable times for the purpose of conducting a review, examination and audit, and Consultant shall preserve all such records for a period of three (3) years after the final payment under this Agreement.

E.     Mechanic's Liens.

Unless such lien arises solely due to Owner's failure to pay amounts under this Agreement as to which there is no good faith dispute, if at any time any liens, interlocutory liens, notices of lien, or suits to enforce them are filed against the property on which the Project is located by Consultant's Subconsultants or anyone else claiming by or through Consultant, then Consultant shall, within ten (10) days after the date of receiving written notice of the filing of same, discharge, remove or bond off such lien to Owner's satisfaction. Until such discharge or removal, Owner shall have the right to withhold from any sums payable under this Agreement any amount which Owner deems appropriate to pay such lien and to pay all related costs and

403962338v2

expenses, including attorneys' fees, for which costs and expenses Consultant shall be liable to Owner. This provision shall survive the completion of the Services, final payment, or earlier termination of this Agreement.

F.     Notices.

All notices between the parties required by this Agreement shall be in writing and may be given by messenger or may be sent by United States registered or certified mail (return receipt requested), Federal Express, Express Mail, or other national overnight courier service, addressed as follows:

| | |
|---|---|
| If to Consultant: | Wiles Mensch Corporation<br>11860 Sunrise Valley Drive, Suite 200<br>Reston, VA 20191<br>Attn: Joseph P. Mensch |
| If to Owner: | ICG 16th Street Associates, L.L.C.<br>c/o The JBG Companies<br>4445 Willard Avenue, Suite 400<br>Chevy Chase, MD 20815<br>Attn: Kevin North |
| with a copy to: | ICG 16th Street Associates, L.L.C.<br>c/o The JBG Companies<br>4445 Willard Avenue, Suite 400<br>Chevy Chase, MD 20815<br>Attn: Britt Snider |
| and a copy to: | ICG 16th Street Associates, L.L.C.<br>c/o The JBG Companies<br>4445 Willard Avenue, Suite 400<br>Chevy Chase, MD 20815<br>Attn: Legal Department |
| and a copy to:<br>(which shall not<br>constitute notice) | Pillsbury Winthrop Shaw Pittman LLP<br>1650 Tysons Blvd., 14th Floor<br>McLean, VA 22102<br>Attn: Scott E. Barat |

Notwithstanding the foregoing, routine communications in furtherance of the Services may be given by either party hereto to the other by any of the foregoing methods or by facsimile transmission or electronic mail.

G.     Confidential Information.

Consultant shall not use any image of the Project or Owner's facilities in any manner whatsoever without Owner's express written consent. Consultant agrees that all knowledge and information not already considered within the public domain that Consultant may acquire from Owner or its officers, staff, agents, or other contractors or consultants of Owner, or by virtue of the performance of Services hereunder, will for all time and for all purposes be regarded by Consultant as strictly confidential and held by Consultant in confidence, except to the extent necessary to be disclosed in order to perform the Services. The parties agree that

9

403962338v2

Case 1:17-cv-01070-TNM   Document 1-3   Filed 06/05/17   Page 54 of 133

information shall not be deemed confidential to the extent that any of the confidential information furnished is or becomes part of the public domain without violation of this Agreement; is lawfully obtained by Consultant from a third party who is not subject to restrictions similar to those herein contained as to the use or disclosure thereof; is furnished to others by Owner without restrictions similar to those herein contained as to the use or disclosure thereof; is developed by Consultant completely and independently of any such disclosure by Owner; is ascertainable from a commercially available product; or is disclosed pursuant to the order or requirement of a government body, court, or administrative agency. If Consultant is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any confidential information, Consultant will promptly notify Owner of such request or requirement so that Owner may seek an appropriate protective order or waiver in compliance with provisions of this Agreement. If, in the absence of a protective order or the receipt of a waiver hereunder, Consultant is compelled to disclose confidential information or else stand liable for contempt or suffer other censure or penalty, Consultant may disclose only such of the confidential information to the party compelling disclosure as is required by law.

H.    Severability.

If any terms or provisions of this Agreement shall be invalid or unenforceable to any extent, the remainder of this Agreement shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent.

I.    Entire Agreement.

This Agreement represents the entire and integrated agreement between the parties hereto and supersedes all prior negotiations, representations or agreements, either written or oral.

J.    Multiple Counterparts.

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original. Upon execution of such counterparts, all counterparts together shall constitute the entire Agreement.

K.    Interpretation.

This Agreement shall be construed in accordance with its plain meaning, without giving any effect to any implication or inference arising from the fact that it may have been drafted by or on behalf of any party to this Agreement.

[Signatures on Following Page]

IN WITNESS WHEREOF, the parties hereto have made and executed this Agreement on the day and year first set forth above.

OWNER:

ICG 16TH STREET ASSOCIATES, L.L.C.

By:    JBG/Company Manager III, L.L.C.,
its Managing Member

By: _____

Name: ___W. Matt Kelly_____
          Managing Member

Title: _____


CONSULTANT:

WILES MENSCH CORPORATION


By: _____

Name: Mary Ramsey _____

Its:    Președint _____

11

EXHIBIT A

DESCRIPTION OF BASIC SERVICES

Consultant's Basic Services shall consist of the following Tasks:

## SURVEYING SERVICES

### 1 Boundary, Topographic and Utility Survey

Survey - Based on the extent of anticipated project site work, Consultant shall prepare a survey to include boundary, topographic and utility information to provide an existing conditions base upon which a development team can rely on in the performance of the design work. Consultant shall prepare this survey as a CAD base for all areas within the limits of this contract and will be provided to the Owner in hardcopy and AutoCAD file formats. Consultant shall furnish the required services (office and field) to provide the Owner with boundary, topographic, and utility information to include the following elements:

1. Topographic spot elevations and contours over the site to include pavements, curbs, site retaining walls, at breaks in grade, building entrance elevations, site structures, tree lines, fences, and general man-made surface feature information. The basis for the elevations will be the DCDPW vertical datum; the contour interval will be one (1) foot with spot elevations being shown as required on "hard" surfaces (ie. top of curb, etc.).

2. Based on the extent of anticipated project site work, Consultant shall prepare a survey to include observable utilities to provide an existing utility base. Consultant shall solicit available records from utility purveyors known in the site area and use those records to compile and display on the existing utility base. Consultant shall furnish the required services (office and field) to provide the Owner with an existing underground utility base in accordance with ASCE Standard 38-02 "Standard Guidelines for the Collection and Depiction of Existing Subsurface Utility Data". A brief summary of this standard's quality levels (A- D) follows. Services are included if marked below.

__A: Highest quality location, visually verified via test holes and located both horizontally and vertically by survey

__B: Utilizing surface geophysical techniques to determine the existence of, mark the location, and locate horizontally by survey

X_C: Location plotted from record information as correlated with surveyed surface features

__D: Lowest quality level, location plotted from public or utility company record information only

12

.......... .

X__:   Survey manhole invert elevations:  Survey the sanitary/storm drainage manhole inverts for size and actual elevation, or elevation of manhole bottom for accessible manholes.

3.   Consultant shall furnish the required services to provide the Owner with a boundary survey of the site. The boundary survey will include an examination of public survey records found in the Office of the DC Surveyor. The survey will resolve the differences between dimensions and angles of record and those measured in the field to derive the actual on site boundary available for the proposed project.

Consultant assumes that adequate horizontal and vertical controls are available on and/or within two hundred feet (200') of the subject property. If in the surveyor's opinion the aforementioned controls are conflicting or inadequate, additional efforts may be required to tie into DC control monumentation. In this event the Owner shall be notified of this condition in writing prior to commencement of the work and the surveyor would provide the Owner with a written estimate of the additional costs, if any, for approval. No work shall be performed without prior written approval from the Owner.

2 Survey to Mark

Consultant shall provide the necessary record research, field survey, office computations, and meetings with the office of the DC Surveyor, to obtain an approved and recorded "Survey to Mark showing Actual Angle & Measurement and Area by Measurement".

3 WMATA Records

Consultant shall furnish the required services (office and field) to reflect by record the existing WMATA (Washington Metropolitan Area Transit Authority) right-of-way and tunnel along I Street, N.W. adjacent to the subject property.

4 Extension of Survey

Based on the extent of anticipated project site work, Consultant shall provide survey services to extend the existing survey along 16th Street NW to K Street NW and along K Street to the previous WMC survey (2013-01-16) prepared per Task 1.

13

CIVIL ENGINEERING

SECTION I – SCHEMATIC

DESIGN

A.   SD Documents

Consultant shall prepare site plans and site information for a Schematic Design set of documents for the proposed commercial development as described above.  Schematic Design is normally interpreted to consist of a set of documents brought to a 15% level of final document completion with possible options also identified.

Consultant shall be responsible for the following portions of the Schematic Design Submission to the Owner based on a Site Plan background.  For the purposes of this proposal, the Schematic Design set will show schematic level information for most of the general infrastructure plan features but no profiles, detail sheets, or extensive detail will be shown on the plan.   No detailed phasing or interim condition plans are anticipated or included as part of this proposal although simple phase delineations will be incorporated if necessary.

1.     A Site Plan referencing the schematic level external features of the buildings and structures, including but not limited to walkways, driveways, plazas, streetscape, and any other open spaces developed and provided by the other Design Consultants.  Consultant shall coordinate and assist in the development of these site elements with the Owner and the other Design Consultants prior to submission of the site layout plan.

2.     A rough grading plan showing existing and proposed contours, and existing structures. Grading will be coordinated with the Architect's office to assure the proposed building elevations are set for building height relationships, surface drainage, and existing utility systems.

3.     Completion and submission to the District of Columbia of a Stormwater Management (SWM) concept plan that takes into account the building and site improvements anticipated for this project.

4.     Attendance at up to Two (2) meetings with DC Public Space, utility purveyors, and/or Water Quality Division to review the impacts of the proposed construction, stormwater management, and the new service or relocation requirements and utility availability.      Consultant has not included any public hearings, contractor staging or haul route plans as part of this proposal since these requirements are not known at this time.  Any potential services for completion of right of way covenants, plats or plat recordation services for the project are excluded.

14

5.  Consultant shall develop site plan information and coordinate with the other design consultants. Consultant shall setup and coordinate the Preliminary Design Review Meeting ("PDRM") with DDOT to submit plans for both "Existing Conditions" and proposed work divided into "Surface Work" in public space such as bay windows, porches, handicap ramps, street lights, landscaping, retaining walls, fences, railings, lead walks, and all other paving and streetscape fixtures; and "Subsurface Work" in public space such as vaults, electrical conduit, all other subsurface utilities and sheeting & shoring.

### SECTION II – DESIGN DEVELOPMENT

Consultant shall provide development of the site plans and site information to meet the prevailing standards of civil engineering in the District of Columbia for a Design Development set of documents for the project as described above.  Design Development normally interpreted to consist of a set documents brought to a 30% level of final document completion with a single design option more fully developed.

Consultant shall be responsible for the following portions of the Design Development Submission process to the Owner based on the final Site Plan selected.  For the purposes of this proposal, the Design Development set will show 30% complete information for most of the general infrastructure plan features but no profiles, detail sheets, or extensive detail will be shown on the plan.   No detailed phasing or interim condition plans are anticipated or included as part of this proposal.

1.      Provide a general site demolition plan to identify site plan elements to be removed.

2.      A Site Plan referencing the 30% level external features of the buildings and structures, including but not limited to easements, walkways, driveways, plazas, landscape materials and any other open spaces developed and provided by the Architect.  Consultant shall coordinate and assist in development of these site elements with other Design Consultants prior to submission to the Owner of the site layout plan.

3.      A more detailed grading, and drainage plan showing existing and proposed contours, and storm runoff.  General grades and elevations will be finalized at this time through coordination with the other design consultants to assure that the next phase of design can rely upon these contours and elevations to complete the detailed profiles and sections required in the Construction Document set.

4.   Preliminary Sediment and Erosion Control Plan. The SEC plans may be further developed to a permit set level at the discretion of WMC-DC and approval of the team, for submission of first review and then final approval by the DCRA Water Quality Division.

5.   Development of a Stormwater Management (SWM) concept plan into a 30% level of completion.

6.   Attendance at up to One (1) meeting with DC Public Space, and other public agencies.

**B.   Preliminary Design Review Meeting**

1.   Consultant shall develop site plan information and coordinate with the other design consultants. Consultant shall setup and coordinate the Preliminary Design Review Meeting ("PDRM") with DDOT to submit plans for both "Existing Conditions" and proposed work divided into "Surface Work" in public space such as bay windows, porches, handicap ramps, street lights, landscaping, retaining walls, fences, railings, lead walks, and all other paving and streetscape fixtures; and "Subsurface Work" in public space such as vaults, electrical conduit, all other subsurface utilities and sheeting & shoring.

Consultant shall also meet with the team Two (2) times during this stage to coordinate the plans developed above as well as to assist in review of plans and documents prepared by others for the Schematic Design submission to the Owner.

**SECTION III – CONSTRUCTION DOCUMENTS**

In the Construction Document Phase, Consultant shall provide final development of the design approved during the previous phases for the project. Consultant shall investigate, re-confirm, and develop the site and specifically, the grading and landscape improvements. Consultant shall review items that have overall implications for the project, including final approvals from review agencies.

Consultant shall attend up to Two (2) regularly scheduled team meetings as required to develop site plan information and coordinate with the other design consultants and the Owner on design details and implications. Consultant also anticipates providing the team

A-1

with drawings to update and expand upon the cost estimates that would have been developed under the previous phases.

All major design decisions will be finalized early in this phase including final layout of any site design components; and any site security programs. Consultant shall develop site plan information and coordinate with the other design consultants.

A.   Construction Documents

Consultant shall prepare site plans at the scale to be approved by the Owner to include appropriate elements described below:

1.   Provide a separate Raze Package to demolish the existing facility and meet the requirements of the DC Raze process. Final site demolition plan to identify site plan elements to be removed in addition to the Raze Package.

2.   Provide final layout and horizontal control for the site elements and finalize coordination of the site features to fully represent the site layout and dimensioning as may be designed by other Design Consultants.

3.   Provide curb profiles for the entire frontage of the project as may be required. Profiles of existing curbs to determine necessity for establishing new curb grades per DC requirements. Provide a site visit to determine the level of reusable curb and define in construction documents. If not fully defined during the previous phases, Consultant shall meet with Public Space to determine requirements for any additional public space improvements not included herein.

4.   Finalize coordination and transfer of the grading plans to establish vertical control for site features based on the proposed top of curb and first floor elevations provided by others. Consultant assumes that any required detailed grading will be shown on Consultant's site or landscape plans.

5.   Paving plans to show pavement surfaces and shall include typical DC standards for roadway, driveway, alley and concrete sidewalks.

6.   Consultant shall finalize the utility plan to show existing and proposed inlets, storm drainage conveyance, and anticipated routing for new and relocated utilities to include water, sanitary and storm. Utilities will be coordinated with the Plumbing Engineer's office to assure the proposed utility

A-2

elevations and sizes are set for building relationships, surface drainage, and utility systems.

7.    Preparation of final Sedimentation and Erosion Control Plans.

8.    Preparation of detail sheets for site civil elements including but not limited to curbs, gutters, pavement, and sedimentation & erosion control methods.

9.    Coordination    with    project    and    design    of    applicable interdisciplinary technical items for locations, elevations, sizes and other requirements.

10.   Provide documentation for Division 2 Sitework specifications relating to the civil engineering project work.    Specifications master provided by Consultant will be modified appropriately for this project and provided to the Owner for incorporation into the overall specification set.

11.   Consultant shall assist the permit expediter as required to obtain the necessary permits including but not limited to DC Water, DC Water Quality Division for Sedimentation & Erosion Control, Stormwater Management approvals, and building permits. Consultant shall also assist the MEP Engineering firm as well to coordinate meetings with the utility companies as necessary should the MEP incur customer service problems with the initial contacts or response to submissions by the team.

12.   Stormwater Management Design -- Consultant shall include analysis, and computations to determine the effects of the proposed development on the existing downstream conditions. Potential modifications to the existing conditions will then be evaluated in conjunction with design of stormwater management facilities to meet quality and quantity controls for the building as required by the District Department of the Environment. The final design of the stormwater management facilities will include the theoretical analysis and computations for a fully developed watershed area draining to this facility.

Consultant shall provide the on-site hydrologic analysis and computations associated with development of the watershed as required by the District.    Maximum development conditions will be assumed for all routing and time of concentration analysis. Outfall conditions will be evaluated based on existing documentation and may be subject to additional survey requirements.

The design will be completed in accordance with the District's requirements to address all quantity controls and meet the requirements for Best Management Practices. Volumetric and component details of the facility will be included as part of the plans, but structural design of any facilities, if

A-3

403962338v2

required, will be provided by others. Consultant shall provide documents as newly required by the District to assist the owner in completion of the Declaration of Covenants for the Stormwater Management Facilities.

B.    LEED

1.    Consultant shall provide design assistance to meet LEED for site infrastructure elements. LEED requirements may include assistance in the design of water storage and recycling systems, dual water systems, or other techniques to obtain credit for the LEED Certification. Consultant shall provide initial consultation and feasibility review to develop strategies to maximize potential LEED credits given the program for the site. As the strategy coalesces, Consultant shall provide calculations to support LEED credit claims as appropriate.

## SECTION IV – TRAFFIC CONTROL PLAN

1.    A Traffic Control Plan has been excluded from this proposal.

## SECTION V – RAZE PERMIT

A.    Raze Documents

Consultant shall prepare site plans at the appropriate scale to consist of an Existing Conditions Plan, as well as a preliminary Sediment and Erosion Control Plan and Sediment and Erosion Control Details as part of this program requirement. Consultant understands that a Topographic and Utility Survey is not currently available for this effort. Upon Authorization to proceed, Consultant shall utilize GIS topography, site visits, photography and request utility record information from the utility purveyors to prepare the Existing Condition Plan. Should this information prove to be insufficient by the reviewers, a complete Topographic and Utility survey can be provided as an additional service.

List of Civil Engineering Drawings for Raze Permit for reference:

- C-1   Existing Conditions Plan
- C-2   Sedimentation and Erosion Control Plan
- C-3   Sedimentation and Erosion Control Details

A-4

SECTION VI – BIDDING AND NEGOTIATION

1.      Bidding and Negotiation services have been excluded from this proposal.

SECTION VII – CONSTRUCTION ADMINISTRATION

Subsequent to the notice to proceed into the construction phase for this project, Consultant shall include the services described below:

A.      Construction Administration Services

1.      Up to Five (5) site visits to attend pre-bid conferences, review the sitework and provide attendance at project meetings including any punchlist visits.

2.      Respond in writing to contractor, Architect or Owner initiated requests for sitework information as it relates to sitework associated with the design.

3.      Review shop drawing submittals for sitework elements including pavement and utility materials.

4.      Consultant does not include any representation on behalf of the Owner or Contractor for certifications that the construction was completed in accordance with the approved plans or specifications, other than that required for stormwater management.

A-5

Items Provided by Owner or Other Team Members

A.    Pertinent records in Owner's possession of the subject property.

B.    Access to the Project site as reasonably required and when reasonably requested by Consultants.

C.    A current title report with copies of all supporting documents for exceptions listed in Schedule B thereto.

D.    Geotechnical investigation and report.

E.    Filing, review, and permit fees, to include but not limited to, stormwater management and sedimentation erosion control fees as required and are to be paid in advance.

F.    Architectural, MEP and structural drawings relative to Consultant's services. Includes layout plans from the landscape architect for streetscape.

    G.    Structural or MEP design of the stormwater management facilities, or other vaults as required in or immediately adjacent to building.

    E.    As-built information from Contractor for the site.

A-6

## EXHIBIT B
## SCHEDULE

- Consultant shall complete the 60% Construction Documents set on or before June 10, 2013
- Consultant shall complete the 70% Construction Documents set on or before July 5, 2013
- Consultant shall complete the 100% Construction Documents set on or before August 16, 2013

B-1

EXHIBIT C

## FEE SCHEDULE AND HOURLY RATES

Fee Schedule

SURVEY

| TASK | DESCRIPTION | FEE |
|------|-------------|-----|
| 1 | Boundary, Topographic and Utility Survey | |
| 2 | Survey to Mark | |
| 3 | WMATA Records | |
| 4 | Extension of Survey | |

CIVIL ENGINEERING

| TASK | DESCRIPTION | FEE |
|------|-------------|-----|
| I.A | Schematic Design | |
| II.A | Design Development | |
| III.A | Construction Documents | |
| III.B | LEED | |
| IV | Traffic Control Plan (excluded) | |
| V | Raze Permit | |
| | Subtotal | |

CONSTRUCTION

| VI | Bidding and Negotiation (excluded) | |
|------|------------------------------------|-----|
| VII | Construction Administration | |
| | Subtotal | |

TEAM MEETINGS IN NEW YORK

| | Kick-Off Meeting | |
|---|------------------|-----|
| | Subtotal | |

C-1

403962338v2

<u>Hourly Rates</u>

Principal

Project Manager

Sr. Engineer

Engineer/Sr. Designer

Planner

Jr. Eng/Designer

Sr. Surveyor

Surveyor

Survey Crew

Sr. Landscape Architect

Landscape Architect

CAD Technician

Clerical

C-2

**EXHIBIT D**

**REIMBURSABLE EXPENSES**

Expenditures specifically for the Project and each Task, including the following:

- Document Reproduction
- Plotting Services
- Telecommunications
- Postage and Courier Charges

D-1



EXHIBIT

F

















DEMOLITION:

SITE NOTES:

STANDARDS FOR SHEETING AND SHORING ADJACENT TO DC WATER UTILITIES:

DEFINITIONS:

POINTS OF CONTACT:

LOCATION OF DC WATER UTILITIES:

PILED AND SHEET PILING:

VIBRATION MONITORING:

BRACING AND TIEBACKS:

CONSTRUCTION MONITORING:

TEST PIT NOTE:

DCWATER GENERAL CONSTRUCTION NOTES:

SITE LEGEND:

URBAN FORESTRY NOTES:

GENERAL NOTES:

LEGEND

UTILITY REFERENCES:

UTILITY CONTACTS:

VICINITY MAP
SCALE 1" = 300'
SQUARE: 185 LOT: 41
ADDRESS:
900 16TH STREET, N.W.
WASHINGTON, DC

PROJECT NARRATIVE:

ABBREVIATIONS:

CIVIL DRAWING INDEX:
- C-001 NOTES, LEGEND AND ABBREVIATIONS
- C-101 EXISTING CONDITIONS PLAN
- C-102 DEMOLITION PLAN
- C-103 EROSION AND SEDIMENT CONTROL PLAN
- C-104 SITE PLAN
- C-105 UTILITY PLAN
- C-106 GRADING PLAN
- C-301 UTILITY PROFILE
- C-401 EROSION AND SEDIMENT CONTROL DETAILS
- C-402 SITE DETAILS
- C-403 DCWATER DETAILS
- C-601 DC WATER FORMS
- C-701 STORMWATER MANAGEMENT PLAN GREENROOF
- C-702 STORMWATER MANAGEMENT PLAN CISTERN

NOTIFY "MISS UTILITY" AT 1-800-257-7777 48 HOURS IN ADVANCE BEFORE COMMENCING THE WORK

WILES MENSCH CORPORATION

900 16th Street NW

900 16th Street NW
Washington DC 20006

900 16th Street Associates, L.L.C.

PERMIT SUBMISSION

NOTES, LEGEND AND ABBREVIATIONS

C-001

North

16th Street, N.W.



Note: 1. Positive dimensions reflect surveyed point being South of property line. Negative dimensions reflect surveyed point being North of property line.

2. Dimensions shown from property line may change slightly upon completion of the Survey to Work.

The JBG Companies

North Elevation Exhibit
900 16th St N.W.
Building North of site



**K C I** ENGINEERS • PLANNERS • SCIENTISTS • CONSTRUCTION MANAGERS
TECHNOLOGIES  8161 Maple Lawn Boulevard, Suite 350 • Fulton, MD 20759 • 410-792-8086 • (FAX) 301-773-4680

### WORK AUTHORIZATION

Date: January 2, 2014 (Revised)

This Work Authorization is by KCI Technologies, Inc. and

Client Name:  <u>Bingham McCutchen LLP</u>  Attention:  <u>Lynda M. Bayle</u>

Address: <u>2020 K Street, NW, Washington D.C.</u>

Client Phone:  <u>202-373-6064</u>  Client Fax:  <u>202-373-6001</u>

Work to be Performed:  <u>ALTA/ACSM Land Title Survey</u>

Sites or Property Names:  <u>1601 I Street NW, Washington D.C.</u>

KCI Job No.:  <u>To Be Assigned</u>  Work Order No.: <u>To Be Assigned</u>

I hereby authorize the following work:

## See attached Scope of Services

Any items not specifically mentioned in the scope of services portion, including additional Table A items requested after the acceptance of this proposal, will be considered extra and will need additional fees or can be billed at the attached hourly rates. In either case, an additional signed authorization will be needed prior to initiating the extra services.

Reproductions and prints required in the normal performance of our services on this project, and mileage to and from the site, is included in the base proposal. We will invoice you at cost + 15% for fees associated with the filing of applications and permits and/or for special mailings and courier fees as requested. For any extra work, all direct expenses will be additionally invoiced, including mileage at $0.56 per mile.

Invoices will be issued on a periodic basis or at the completion of a specific phase of work. Invoices will be due at closing, and undisputed invoices will be subject to a late charge of 1.5 percent per month on any balances remaining over 30 days after the invoice date. KCI Technologies, Inc. will not be liable for back charges for corrective construction work resulting from alleged errors unless notified in reasonably sufficient time to evaluate the alleged defective condition, and to assess and monitor the intended corrective action.

General Provisions: It is agreed that the attached General Provisions are accepted and are made part of this contract.

KCI Technologies, Inc.

Edward W. Siegert, LS
Associate / Survey Practice Leader

KCI TECHNOLOGIES, INC.  *Employee-Owned Since 1988*  WWW.

<div style="border:2px solid">EXHIBIT<br>**G**</div>

<u>SCOPE OF SERVICES</u>
ALTA/ACSM Land Title Survey
Lot 41 Square 185
Northwest Corner of 16th and I (Eye) Streets, NW
a.k.a. 1601 I Street, NW and/or 900 16th St, NW
Washington D.C.

KCI Technologies, Inc. ("KCI") will prepare an "ALTA/ACSM LAND TITLE SURVEY" of the above listed site prepared in accordance to the 2011 Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys and includes Items 2, 3, 4, 6(b), 7(a), 7(b)(1), 7(c), 8, 9, 10(a), 11(a), 13, 14, 16, 17, 18, 19 and 20 (a) off the Optional "Table A" Items. All other "Table A" items are specifically excluded.

Survey will include a review of a current Commitment for Title Insurance to be furnished by client, said commitment to be accompanied by all supporting/underlying documents, instruments, plats, plans, etc., as referenced within the Commitment, including the vesting deed. Before work can begin, KCI, must be furnished with a copy/copies of the legal description(s) which identifies the property to be surveyed and a signed work authorization.

KCI proposes a minimum 21 day turnaround for first draft of survey to be submitted for review and comment. Time period to begin upon signed notice to proceed authorization <u>and</u> receipt of current Title report and supporting documents (note -- Commitment received prior to bid). Weather, issues with site access, and unknown boundary issues may influence the schedule proposed.

Additional Clarifications, Assumptions, Exclusions concerning Table A Items chosen :

- For Alta Table A Item 6(b). KCI will address setback, building height and floor space restrictions <u>only</u> for the subject property in tabular or note form based on one or more of the following : (i) information provided by client (i.e. zoning study by others), (ii) information contained or disclosed in record documents reviewed or provided, and/or (iii) a literal listing of the same based on the current jurisdictional ordinance for the applicable zoning classification. No zoning study is being proposed which may disclose variances or interpretations from current code(s) and restrictions. Setback lines will be shown graphically only if existing in, or on, a recorded document. (Note : Title Commitment received prior to bid appears to contain the necessary information for satisfying this item.)

- For Alta Table A Items 7(a) (b1) and (c). Building dimensions, square footage and height will address the above ground building(s) portion only. Site is known to have an underground building/garage for which exterior corners for dimensioning and area cannot be accessed. Also applicable to Item 10(a) for determination of shared party walls with others.

- For Alta Table A Item 19 -  A statement will be made on the Survey as to whether or not wetland markings were observed in the field portion of the survey, along with whether the site has any wetland areas within it appearing in the database of the National Wetlands Inventory. This will not be a final determination as to whether or not the site contains wetlands and KCI is not proposing a field assessment of the same.

Proposed Fee : Lump Sum ▮▮▮▮

Work Authorized (Please sign and return to this office):

ICG 16ᵀᴴ STREET ASSOCIATES, L.L.C.

By:  JBG/Company Manager III, L.L.C.,
     its Managing Member

By:  _A. Leslie Ludwig_

Name: A. Leslie Ludwig as Attorney- in- Fact

Title: for Brian P. Coulter, Managing Member

www.kci.com
Employee-Owned Since 1988



# ENGINEERS | PLANNERS | SCIENTISTS | SURVEYORS

## KCI Mid-Atlantic Survey Division
## HOURLY RATE SCHEDULE
### EFFECTIVE JULY, 2013

Delaware

Florida

Georgia

Indiana

Maryland

New York

North Carolina

Ohio

Pennsylvania

Tennessee

Virginia

West Virginia

Washington, D.C.

Project Manager/Registered Surveyor

Field Supervisor

Senior GPS Technician

Project Surveyor

Senior Computations Technician

Processor

Computations Technician

Computations Aide

CADD Technician

1-Man Robotic

2-Man Survey Crew

3-Man Survey Crew

4-Man Survey Crew

Word Processing

Principal (Division)

NOTE: Prices subject to annual review each July 1st

*Knowledge • Creativity • Innovation | www.kci.com | Employee-Owned Since 1988*

# KCI TECHNOLOGIES, INC.
# GENERAL PROVISIONS
## (Ver. July 2008)

The General Provisions set forth herein are incorporated by reference in the Proposal for the performance of certain services described as the "Work" in the Proposal made by KCI Technologies, Inc., a Delaware corporation ("KCI"), dated _03/01/2011_ to _Mirabile Construction Company, Inc._ ("Client"). These General Provisions shall constitute, along with the Proposal, a final, complete, and binding agreement (the "Agreement") between Client and KCI upon Client's acceptance of the Proposal. To the extent they are inconsistent or contradictory, the express terms of the Proposal take precedence over the General Provisions.

**1. ACCEPTANCE OR REJECTION OF PROPOSAL**

The Proposal shall be valid for a period of thirty (30) days from the date thereof. Acceptance thereafter shall be conditioned on KCI's reaffirmation of the Proposal. If, upon submission of this proposal to Client, Client fails to return a signed copy to KCI and Client knowingly allows KCI to proceed with work, such services shall be deemed performed pursuant to the Proposal and these General Provisions, which shall be binding the same as if the Proposal were fully executed.

**2. ADJUSTMENTS TO QUOTATION (COST ESTIMATION)**

Fees quoted in the Proposal are based on current salaries and operational costs. Unless a lump sum fee is quoted, KCI shall have the automatic right to adjust the fee basis to reflect change in salaries and operational cost on each twelve (12) month anniversary following the date of the Proposal. Estimates stated in the proposal are provided for convenience of the Client and KCI is not bound by nor does it guarantee such estimates.

Unless expressly identified as a cost item in the fee proposal, KCI's fees do not include sales tax or other governmental levies. In the event that taxes or other assessments are applied to the fees generated by KCI services, the client agrees that such taxes or assessments shall be added to the fee base quoted herein and shall become due and payable when invoiced by KCI.

**3. CONDUCT OF THE WORK**

All concept, preliminary and final plans prepared by KCI will be submitted to client for approval prior to or concurrent with submittal to appropriate governmental authorities. If Client does not respond to such plans within five (5) days of receipt, the plans shall be deemed approved by Client. After the Client's approval, any change shall be deemed Additional Work for which KCI shall receive additional compensation. KCI shall not be obligated to incorporate changes requested by Client into its plans if, in the opinion of KCI, such changes would result in a substandard work product.

KCI will make every reasonable effort to provide a survey crew as requested but it cannot guarantee the time within which a survey crew will be available. The size of the survey crew shall be determined by KCI based on the work to be performed. A minimum of four (4) hours shall be charged anytime a survey crew visits a site, all charges being portal to portal.

Client agrees that KCI shall not be liable for work performed by other parties, for the accuracy of data supplied by other parties on which KCI may rely, or for testing or inspection work performed by others.

Any reference to existing subsurface objects is provided for general reference based on existing information supplied to KCI by the Client or others and such locations are not to be considered exact. At least forty-eight (48) hours before penetrating the ground, Client agrees to contact the local "Miss Utilities" and have a utilities representative on site. In the event KCI's work includes penetration of the ground, Client agrees that KCI shall not be responsible for any loss or damage claimed to result from said penetration unless direct result of KCI's sole negligence. Client agrees to indemnify and hold KCI harmless from any claim, suit or proceeding for loss or damages to person or property of others relating to said penetration except to the extent said damages are the direct result of KCI's sole negligence.

Client further agrees to indemnify and hold KCI harmless from any loss or damages to KCI personnel or equipment resulting from any ground penetration except when it is the direct result of KCI's sole negligence or when caused by normal wear and tear.

Subsurface and earth fill data are informational only. KCI does not guarantee such data.

Although KCI will attempt to complete all services in a timely fashion, KCI does not guarantee, expressed or implied, the time within which such work will be completed.

**4. RIGHT OF ENTRY; PERMITS**

Client agrees to provide right of entry and all permits necessary for the completion of KCI's services under this Agreement at no cost to KCI.

**5. DOCUMENTS**

All documents, including drawings and specifications, prepared or furnished by KCI pursuant to this agreement, are instruments of service and the property of KCI. Client may make and retain copies, subject to Client's compliance with Section 8, herein, but may only use such documents for the purposes described in the Proposal. Any other use shall be prohibited, and Client shall indemnify and hold harmless KCI for any liabilities, damages, losses, claims, and expenses arising therefrom.

**6. RISK ALLOCATION**

Client hereby agrees that, to the fullest extent permitted by law, KCI's maximum liability to Client for any and all claims, actions, damages, or losses arising out of or in any way related to KCI's allegedly negligent services or breach of contract provided pursuant hereto shall not exceed the lesser amount of (1) the amount of any insurance coverage available to satisfy any claim made against KCI within the scope of any such coverage in existence at the time that the claim is resolved by way of settlement award or judgement (exclusive of any required deductible); or (2) three times total fee paid to KCI not to exceed $500,000.00 (total fees shall not include direct expenses). Additional coverage may be obtained at client's expense. Failure to exercise option for additional coverage waives any claim of liability beyond such limits Client further agrees that in no event shall KCI be liable for any claims or damages of any nature (including costs relating thereto) unless such claims and damages are the direct result of KCI's negligent performance of the work under this agreement.

Plans and designs prepared by KCI are predicated on sound engineering assumptions that must be tested and adjusted as conditions warrant during construction. If Client does not retain KCI for the purpose of construction services for the implementation of the Plans or Designs, then Client agrees to assume the risk of improper implementation and to hold KCI harmless from any loss or damage resulting from the failure to retain KCI to oversee the implementation of its plan or design.

Client further agrees that KCI shall not be responsible or liable for the cost of any and all corrective actions allegedly caused by KCI unless KCI is provided a reasonable opportunity to participate in the decision on said corrective work.

**7. HAZARDOUS SUBSTANCES/MOLD INDEMNIFICATIONS**

Client warrants that it has and will comply with all lawful obligations regarding hazardous or toxic substances, and it agrees to indemnify and hold KCI harmless from any loss, damage, expenditure or liability arising out of or in any way relating to the presence, discharge, exposure or release of hazardous or toxic substances of any kind except to the extent it is the direct result of KCI's sole negligence.

Client hereby agrees that, to the fullest extent permitted by law, KCI's maximum liability to Client for any and all claims, actions, damages, or losses arising out of or in any way related to mold shall not exceed the amount of any insurance coverage available to satisfy any claim made against KCI within the scope of any such coverage in existence at the time the claim is resolved by way of settlement award or judgment (exclusive of any required deductible). Client further agrees that in no event shall KCI be liable for any claims or damages of any nature, regardless of the insurance, (including costs relating thereto) for bodily or personal injury related to mold claims.

**8. PAYMENTS**

Invoices submitted by KCI to Client are due and payable in full from the date of said invoice without retainage and payment shall not be contingent upon receipt, of funds from third parties. If an invoice remains unpaid for more than thirty (30) days from the date of the invoice, a service charge of one and one half percent (1-1/2%) per month, eighteen percent (18%) per annum, shall be assessed on all unpaid amounts dating from the date of the invoice. Failure to render full payment within thirty (30) days shall be deemed substantial non-

Page 2 of 2                                                                                 Ver. July 2008

compliance and KCI, at its option may undertake any or all of the following remedies: (1) stop all work, provided Client is given three (3) days prior written notice; (2) withdraw all certifications and plans previously submitted; (3) assert a lien on the property pursuant to applicable law; (4) file suit for the collection of said overdue invoices in any Court of competent jurisdiction; and (5) undertake any other remedies accorded it by law or this Agreement. An exercise of one or more of these actions shall not be deemed a waiver of future exercise of other actions. Client agrees to indemnify and hold KCI harmless from any fees and expenses incurred by KCI as a result of Client's non-payment, including, but not limited to cost of personnel time, court costs, litigation expenses and reasonable attorneys fees.

**9. ASSIGNS**
Client may not delegate, assign, sublet or transfer its duties or interest in this Agreement without the written consent of KCI.

**10. SAFETY RESPONSIBILITY**
KCI shall not be responsible for any safety precautions or programs of Client or any of Client's contractors or representatives. KCI shall only be responsible for the safety of its own employees.

**11. MEDIATION/ARBITRATION**
Client agrees that all claims, disputes and other matters in question between the parties arising out of or relating to the Agreement or breach thereof shall first be submitted for non-binding mediation to any one of the following, as agreed to by the parties: American Arbitration Association, American Intermediation Service, AmeriGord, Dispute Resolution Inc., DisSpute or Judicate. Any party hereto may initiate mediation within the time allowed for filing for arbitration as set forth below and the parties hereto agree to fully cooperate and participate in good faith to resolve the dispute(s). The cost of mediation shall be shared equally by the parties hereto. Any time expended in mediation shall not be included in calculating the time for filing for arbitration.

If mediation fails to resolve the claim or dispute, the matter shall be submitted for arbitration with the American Arbitration Association under the Construction Industry rules, unless the parties agree otherwise or unless a Plaintiff not a party hereto institutes litigation in a Court of competent jurisdiction and said Court takes personal jurisdiction over one of the parties hereto regarding the same subject matter as in dispute between the parties hereto.

No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or in any other manner, any additional person not a party to this Agreement except by written consent of the parties and such consent to arbitration involving an additional person(s) shall not constitute consent to arbitration of any dispute not described therein. This Agreement to arbitrate and any agreement to arbitrate with an additional person(s) shall be specifically enforceable under the prevailing arbitration law.

The demand for arbitration shall be made within one (1) year of the date the claimant knew or should have known of the existence of the claim, dispute or other matter. If the demand for arbitration is not within one (1) year the claim, dispute or other matter shall be forever barred. Both mediation and arbitration shall be optional and not mandatory at KCI's sole discretion with regard to the collection of earned fees as set forth in section 8, above.

The decision rendered by the arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof. In the event either party makes a claim or brings an action against the other party for any act arising out of the performance of the services hereunder, and the claimant fails to prove such claim or action, then the claimant shall pay all legal and other costs (including attorneys fees) incurred by the other party in defense of such claim or action.

**12. CERTIFICATE OF MERIT**
The Owner shall make no claim (whether directly or in the form of a third-party claim) against the Engineer unless the Owner shall have first provided the Engineer with written certification executed by an independent engineer licensed in the State in which the KCI office submitting this proposal is located, specifying each and every act or omission which the certifier contends constitutes a violation of the standard of care expected of an engineer performing professional services under similar circumstances. Such certificate shall be provided to the Engineer thirty (30) days prior to the presentation of any such claim or the institution of any arbitration or judicial proceeding.

**13. TERMINATION**
Either party shall have the right to terminate this agreement provided three (3) days written notice is given to the other party. In the event of termination, Client shall be liable for payment to KCI for all work performed, and expenses incurred, up to and including the day of termination.

It is understood and agreed that once the Work is started by KCI, only Client or Client's duly authorized representative shall have the authority to order the work stopped on its behalf and only by giving KCI written notice. Client may exercise the right to terminate only if it has made all payments due and owing to KCI.

It is further understood and agreed that, after a termination of the Agreement has been effected by Client or its duly authorized representative in accordance with the notice referred to herein, Client or its duly authorizes representative may, within thirty (30) days of the notice to terminate, order work to resume on the project, provided KCI is given ten (10) days advance notice in writing as to when work shall resume. If Client fails to resume the work as provided herein, KCI shall have no obligation to resume the Work at any time thereafter.

KCI shall not be obligated to resume services under this Agreement until Client has paid all money previously due and owing by Client and a restart fee equal to ten percent (10%) of the balance remaining to be paid under the Agreement. KCI reserves the right to increase this restart fee if necessary to cover the additional expenses generated by starting the Work back up after it has been stopped.

**14. WARRANTY OF AUTHORITY TO SIGN**
The individual signing this contract warrants that he/she has authority to sign as, or on behalf of Client for whom or for whose benefit KCI's services are rendered. If such individual does not have such authority, he/she understands and agrees that he/she is personally responsible for this contract to KCI in addition to any liability which Client may have.

**15. NON-ALTERATION TO TERMS - WAIVER OF RIGHT**
This Agreement and all the terms herein may only be amended, deleted, or otherwise altered by a written document signed by KCI and Client. Only an officer of KCI has authority to waive any matter or to amend the Agreement between KCI and Client.

The failure of KCI to enforce or act upon any right afforded it by this Agreement shall not be deemed a waiver of such right for future acts of a similar nature.

If any term or part thereof is held to be invalid by a Court of competent jurisdiction, that term or part thereof shall be deemed deleted and the remainder of this Agreement shall continue in full force and effect and be binding upon the Parties.

**16. THIRD PARTY BENEFICIARY**
The Owner and Engineer agree that the services performed by the Engineer pursuant to this Agreement are solely for the benefit of the Owner and are not intended by either the Owner or the Engineer to benefit any other person or entity. To the extent that any other person or entity, including but not limited to the project contractor and/or any of its subcontractors, is benefited by the services performed by the Engineer pursuant to this Agreement, such benefit is purely incidental and such other person or entity shall not be deemed a third party beneficiary to this contract.

**17. ENTIRE AGREEMENT**
These General Provisions, any drawings, plans, plats, and/or exhibits attached hereto, and the Proposal to which these items are attached, set forth the entire understanding and agreement between the parties with respect to the subject matter contained therein and shall be binding and insure (except as otherwise provided herein) to the benefit of the parties and their respective successors and assigns. This Agreement supersedes all prior documents, agreements, and understandings between the parties with respect to the transactions contemplated hereby.

**18. CONTROLLING LAW**
This Agreement is to be governed by the law of the place of business of the KCI office submitting this proposal.

Client Signature _____          Date _____

POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that I, W. MATT KELLY of Washington, DC, that I, BENJAMIN R. JACOBS of Bethesda, MD, that I, MICHAEL J. GLOSSERMAN of Bethesda, MD, that I, BRIAN P. COULTER of Bethesda, MD, that I, ROBERT A. STEWART of Bethesda, MD, that I, KENNETH F. FINKELSTEIN of Damestown, MD, that I, PORTER G. DAWSON of Washington, D.C., that I, DEAN M. CINKALA of Potomac, MD and that I, JAMES L. IKER of Washington, D.C., have made, constituted and appointed and by these presents do make, constitute and appoint, A. Leslie Ludwig of Lorton, VA, my true and lawful attorney for me and in my name, place and stead to do all acts necessary in connection with the business and affairs of JBG Properties, Inc., a Maryland corporation, and its affiliates, excluding, however, obligations, guarantees and indemnities personal to me, in connection therewith, and as said true and lawful attorney, A. Leslie Ludwig of Lorton, VA, acting individually, is authorized to sign any and all documents to facilitate my actions concerning the same, and the signature of any of the foregoing as my attorney-in-fact shall constitute action on my behalf.

This Power of Attorney gives and grants unto her full power and authority to do and perform each and every act and thing whatsoever requisite and necessary to be done in connection with the business and affairs of JBG Properties, Inc. and its affiliates, as full to all intents and purposes as I might or could do if personally present, with full power of substitution and revocation, hereby ratifying all that any of said attorneys, or any substitute, shall lawfully do or cause to be done by virtue thereof. This Power of Attorney and the appointments and authorizations granted hereunder shall not be subject to the Maryland General and Limited Power of Attorney Act (Title 17 of the Estates and Trusts Article of the Maryland Code Annotated).

This Power of Attorney expires ___January 23, 2014___

This will certify that a true and correct signature of each said attorney hereinabove appointed is as follows, to wit:

_A. Leslie Ludwig_
A. LESLIE LUDWIG
Signature of Attorney-In-Fact

IN WITNESS WHEREOF, I have hereunto set my hand and seal as of this _14_ day of December, 2011.

BENJAMIN R. JACOBS

MICHAEL J. GLOSSERMAN

BRIAN P. COULTER

ROBERT A. STEWART

PORTER G. DAWSON

KENNETH F. FINKELSTEIN

JAMES L. IKER

DEAN M. CINKALA

W. MATT KELLY

MONTGOMERY COUNTY MARYLAND)

On this _14th_ day of December, 2011, before me personally appeared, each of BENJAMIN R. JACOBS, MICHAEL J. GLOSSERMAN, BRIAN P. COULTER, ROBERT A. STEWART, PORTER G. DAWSON, KENNETH F. FINKELSTEIN, JAMES L. IKER, DEAN M. CINKALA, W. MATT KELLY, known to me to be the person whose name is subscribed to the within instrument and acknowledged that he executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

Name:

Notary Public and Witness:

My commission expires:_____ Marianne Caveny
Notary Public
Montgomery County, Maryland
My Commission Expires: 11/10/13

IN WITNESS WHEREOF, I have hereunto set my hand.

Name:

Witness: Rachael Siffman



EXHIBIT
H

ALTA/ACSM LAND TITLE SURVEY
SQUARE 185   LOT 41
WASHINGTON D.C.

## RECORD DESCRIPTION

All that certain lot or parcel of land together with all improvements thereon loca
the City of Washington in the District of Columbia and being more particularly
follows:

Lot numbered Forty-one (41) in Square numbered One Hundred Eighty-five (1
subdivision made by The Christian Science Board of Directors of The First Cl
Scientist in Boston Massachusetts, as per plat recorded in the Office of the :
District of Columbia in Liber 154 at folio 45.

NOTE: The above lot being more particularly described as follows:

Beginning at a point said point being the Northwest corner of the intersection
and 16th Street North West. Thence running west with the North line of L (EY!

1. S89° 55' 02" W .83.25 feet (M) & (R) to a point marking the corner of Lot
and Lot 48 of Square 185. Thence running with the line of division between L
and Lot 48 of Square 185 the following two courses

2. N00° 05' 00" W 102.47 feet (M) 102.50 feet (R) to a point, thence running

3. N89° 59' 58" W 23.25 feet (M) & (R) to a point, said point also being cor
with a public alley. Thence running north with the East line of division for the
width Public Alley and Lot 41.

4. N00° 00' 02" E 84.15 feet (M) 84.04 feet (R) to a point marking the corr
the Public Alley, Lot 41 and Lot "Of 5", thence running East with the line of
between Lot 41 and the Lot "Of 5",

5. S89° 59' 58" E 106.65 feet (M) 106.50 feet (R) to a point in the West line
16th Street, thence running with the West line of 16th Street

6. S00° 00' 02" W 186.50 feet (M) 186.54 feet (R) to the point of beginning.
containing 14517 square feet or 0.334 acres more or less.



## DC BOUNDARY NOTE

BOUNDARY INFORMATION SHOWN HEREON WAS OBTAINED FROM
OFFICIAL CITY RECORDS AND VERIFIED IN THE FIELD IN SO FAR AS
POSSIBLE. PROPERTY LINE DIMENSIONS FROM OFFICIAL RECORDS
MAY NOT NECESSARILY AGREE WITH ACTUAL MEASURED DIMENSIONS.
ALL PROPERTY LINES IN THE DISTRICT OF COLUMBIA ARE SUBJECT TO
CORRECTION BY THE OFFICE OF THE SURVEYOR, D.C.

## SUBSURFACE GARAGE DETAIL

SCALE 1" = 30'



Exclusive Parking Easement
5 Spaces, Crosshatched
Instrument 2007050786

Non-Exclusive Parking Easeme
Drive Ramps and Aisles, Other
Instrument 2007050786

"HC" - Designated for Handicapped Use

Subsurface Garage Extends Beyond
of 16th Street 8.9' +/- to surveyed li
Limits of external wall inaccessible

Other Easements identified in instrument 2007050786 for other structural comp
in the garage not identified by field survey (e.g. sheeting/shoring, pilings, duct wor

PLOTTED: 9:59:04 AM on Thursday, February 20, 2014"
BY: Ed Saegert Division-P092 Survey Emp.
FILE: M:\22THX\29144689\Field\29144689ALTA.dgn





being in
Christ,
for the
Street
D.C. RECORD NORTH INSTRUMENT #2007050783
South Face of (Adjoiner) On L
Vent
A&T LOT 828
N/F
BFP 1625 Eye Co.LLC
Instrument 184972
East Face of Adj. Building (At Corner) 0.2' +/- West of Alley
Concrete Wall Extends to Adjoining Bldg Face
North Face of Adj. Building (At Corner) 0.06' +/- South of Alley
North Face of Adj. Building (At Corner) 0.04' +/- South of Alley
0.3' +/- Expansion Joint Between Bldgs. At Face
West Face of Wall 0.03' +/- East of Line
N89°59'58"W
23.25'
(M) & (R)
Concrete Beh
End of Curb,Wall,D 0.10' +/- East of Lin
N00°00'0
Concrete
Curb then Wall
Conc.Ram to Garage
Upper
Garage Entrance (Adjoiner)
N00°05'00"W 102.47' (M)
(102.50' (R), Plat 154/45)
Wall at Ground Level
153.0' Along Face of Wall, East Side
Overhanging Concrete Planter
Limits of Lease Area
Instrument 2007050785
Instrument 2010054737
LOT 41
Plaza Easement
Instrument 2007050786
Corner Bldg 0.07' +/- North Of Line
Building Footprint - 4712 Sq.Ft.+/- Including Overhang Areas. (Single Measurement by exterior dimensions)
Height - 66.4' +/-
Brick Plaza
Brick
Corner Bldg 0.05' +/- North Of Line
Ground Level Recessed All Others Overhang.
Limits of Lease Area
Instrument 2007050785
Curbline
Concrete Posts
Planter (typical)
Concrete
(M) & (R)
83.25'
55'02"W

16TH STREET, N.W.

160' WIDE
(PUBLIC STREET)

**SURVEYOR'S CERT**

To: I) Bank of America, N.A., as Administrativ
as their interests may appear, II) ICG 16th
Land Title Insurance Company.

This is to certify that this map or plot and
accordance with the 2011 Minimum Standard
Surveys, jointly established and adopted by
7(a), 7(b)(1), 7(c), 8, 9, 10(a), 11(a), 13, 14, 16,
The field work was completed on January

Jefferson D. Lawrence .
District of Columbia Land Surveyor
License No. 900570

| REVISION |
|---|
| ADDRESS COMMENTS, ISSUE SIGNED AND SEA |
| UPDATED PER REVISED COMMITMENT ISSUED (e.g. EFFECTIVE D |
| SOME EXCEPTION RENUMBERING, AND ADDITION OF INSTRUMENT |

## LEGEND

| | |
|---|---|
| PROPERTY LINE | |
| FENCING | |
| GAS VALVE | ⚙GV |
| GAS METER | ◎ |
| WATER VALVE | ⚙WV |
| WATER METER | Ⓦ |
| SEWER MANHOLE | ◎ |
| STORM DRAIN MANHOLE | ◎ |
| LIGHT POLE | ✦ |
| SIGN | ⊠ |
| HYDRANT | ⛽ |
| ELECTRIC MANHOLE | Ⓔ |

(M) × MEASURED (OR SURVEYED) DIMENSION

(R) = RECORD DIMENSION

Face of Wall
ound (Adjoiner)
'/- West of Line

th Face of Wall
'/- South of Line

Possible Vault Structure

PUBLIC ALLEY

4' (R), Plat 154/45)
84.15' (M)

Monitoring Wells

Vent Pipe

Manhole

Building Footprint ~
5675 Sq. Ft.~
Includes Overlying Areas
Excludes 10'+/- Wall-Only Portion
(Single Measurement by
exterior dimensions)

82.2'

S89°59'58"E  106.65' (M)
(106.50' (R) Plat 154/45)

LOT 43

LOT "OF 5'
A&T Lots B11, B12, B13, & B17
H/F
1600 Capital Associates  LLC
JBG/1600K LLC
Instrument 119131

K  STREET  N.W.

Height ~ 88.1' +/-



Expansion Joint

6'   0.3'

Face of Bldg. Corner 0.3' +/- North Of Division Line
On Line +/- for 16th St. Corner 0.4' +/- South Of Division Line

Ext Brick

ind Lender, its successors and/or assigns
ociates, L.L.C., and ii)  Commonwealth

ey on which it is based were made in
quirements for ALTA/ACSM Land Title
NSPS, and includes Items 2, 3, 4, 6(b),
and 20 (a) of Table A thereof.

_____
_____ 14
Date

| | DATE | BY | | FIELD JA | SCALE | 1" = 20' | |
|---|---|---|---|---|---|---|---|
| | 2/19/14 | EWS | | DRAWN EWS | | | |
| | 2/20/14 | EWS | | CHECKED EWS/JL | KCI JOB NOs. 2914899 04110833 16085039.01 | | |
| | | | | DATE 1/21/14 | | | |

ENGINEERS
PLANNERS
SCIENTISTS
CONSTRUCTION MANAGERS

KCI
TECHNOLOGIES

8161 Maple Lawn Blvd, Suite 150
Fulton, MD 20759
(410) 792-9090
FAX (410) 792-7814
WWW.KCI.COM



**VICINITY MAP**

SCALE 1" = 2000'

## ERAL NOTES

ownership and Deed reference :
6th Street Associates L.L.C. by Special Warranty Deed   recorded as Instrument no. 2007050783.

d and   Assessed area : 17,500 square feet (or 0.4017 acres +/-)
yed or measured area : 17,483 square feet (or 0.4014 acres +/-)

Information reviewed and/or used for this survey :

following plats of subdivision on record In the office of the surveyor for the  District of Columbia :
ion Book 164, page 45,

notes, including wall check notes, as found among the records of the Office of the Surveyor for
rict of Columbia.

address of the subject property per DC Office of Tax and Revenue Assessment Sheet is  *900 16th Street, N.W.,
ton D.C. 20005. An address of *910 was observed posted on the building portion along 16th Street at the north
property shown hereon.

s shown hereon are based on the DC record datum  per recorded Instrument No. 2007050783

ns of utility services are shown hereon by above ground evidence only. No plan  research or underground designation,
g for location of vaults, was performed for this survey.

vey was prepared in accordance with the Commitment for Title Insurance issued by Commonwealth Land Title Insurance
y, Commitment No. 13-002176, having an effective  date of February 6, 2014 at 8:00 am  and containing the following.
d exceptions listed in Schedule B - Section II (all recording references are to the Land Records of the District of Columbia
otherwise specified):

Agreement relating to  the Occupation of Sub-surface Public Space (Vaults) dated November 10, 1989 and recorded
ber 25, 1989 as Instrument No. 23958 in Liber 13054  at folio 582. The Instrument itself contains no plottable Information
blanket In  nature pertaining  to subsurface vaults. Illustrated hereon Is underground vault area shown  per Information
ed from  previous surveys to which this agreement would be applicable.)

Memorandum  of Lease by and between IBG 16th Street Associates, LLC ("Landlord") and Third Church of Christ,
ist, Washington, D.C. ("Tenant") dated as of April 12, 2007 and recorded April 12, 2007 as Instrument No. 2007050785;
ended by Corrective and Confirmatory Memorandum  of Lease dated as of April 12, 2007 and recorded June 15, 2010 as
ment No. 2010054737. (Lease area defined in Instrument No. 2007050785 is shown hereon, remainder of documents
n non-plottable Information.)

r for, provision of water and sewer services on site for existing and/or proposed utility improvements. Includes
defined in the public space that are to be privately owned and maintained, generally for proposed improvements
not believed to have been installed as of the date of this survey. KCI has not performed underground utility research
of this survey.)

med Unit Development Covenant (ICG 16th Street Associates-Z.C. Order No 13-04) by and between ICG 16th Street
es, L.L.C. and the District of Columbia, dated November 11, 2013, and recorded December 5, 2013, as Instrument No.
741. (Non- plottable document requesting and granting new zoning for the site and describing proposed improvements.)

claration of Covenants for a Stormwater Management Facility by and between ICG 16th Street Associates, LLC, a
limited liability company, for the benefit of the District of Columbia, dated January 17, 2014 and recorded January 17, 2014
ment No. 2014006184. (Covenants pertaining to stormwater facilities proposed as a part of proposed improvements onsite.
: exist on site as of the date of this survey.)

: property lies within Zone X (areas determined to be outside the 2% annual chance floodplain) as shown on FEMA
unce Rate Map for District of Columbia, Washington D.C. Map Number 11000100018C, revised date September 27,

earthwork, building construction or recent additions were observed on the subject property at the time of field survey.
iceptions appearing in the title report imply major construction on the site is imminent.

t property shares no party walls with adjoining properties.

zoning classification zone for the subject site per DC online zoning mapping and instrument No. 2013134741 is C-3-C,
it Development ("PUD"). The following is per a literal translation of some of zoning regulations pertaining to the PUD
-C" per the recorded instrument :
UD. guidelines, the maximum building height in the C-3-C Zone District is 130 feet. Decision appearing later in the
t states, "The PUD shall be constructed to a maximum of 112 feet, 3.5 inches, inclusive of the mechanical penthouse.."
UD guidelines the maximum density in a C-3-C District is 8.0 FAR. Zoning Flexibility was requested and granted
PUD. Decision appearing later in the instrument states "The PUD shall have a maximum density of 8.07 FAR."

in the C-3-C Zone District may occupy 100% of the lot, but must provide a rear yard measuring 2.5 inches per
vertical height, but not less than 12 feet. Description of the PUD Project later states, "The new structure will occupy
the site. A court will be provided in lieu of a rear yard."

study was performed or reviewed by KCI Technologies Inc. which may result in variances or differing interpretations
bject property.

king count -- of being within the subsurface garage level : 52 painted spaces, including 4 designated for handicap use

no designations of wetland flagging or markings onsite at the time of the field survey and no wetlands appear
on an online search of the National Wetlands Inventory.



SCALE: 1"= 20'

# ALTA/ACSM  LAND  TITLE  SURVEY

# SQUARE  185    LOT  41

# WASHINGTON  D.C.

| SHEET |
| --- |
| 1 |
| OF |
| 1 |

# COMMONWEALTH
# LAND
# TITLE
# INSURANCE
# COMPANY



**Commonwealth Land Title Insurance Company**
P.O. Box 45023, Jacksonville, Florida 32232-5023

EXHIBIT

I



**Commonwealth**
LAND TITLE INSURANCE COMPANY

Policy Number: 

### OWNER'S POLICY OF TITLE INSURANCE
Issued by
*Commonwealth Land Title Insurance Company*

Any notice of claim and any other notice or statement in writing required to be given to the Company under this Policy must be given to the Company at the address shown in Section 18 of the Conditions.

### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, COMMONWEALTH LAND TITLE INSURANCE COMPANY, a Nebraska corporation (the "Company") insures, as of Date of Policy and, to the extent stated in Covered Risks 9 and 10, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1.  Title being vested other than as stated in Schedule A.

2.  Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from

    (a) A defect in the Title caused by

        (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;

        (ii) failure of any person or Entity to have authorized a transfer or conveyance;

        (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;

        (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;

        (v) a document executed under a falsified, expired, or otherwise invalid power of attorney;

        (vi) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or

        (vii) a defective judicial or administrative proceeding.

    (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.

    (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.

3.  Unmarketable Title.

4.  No right of access to and from the Land.

5.  The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (a) the occupancy, use, or enjoyment of the Land;

    (b) the character, dimensions, or location of any improvement erected on the Land;

    (c) the subdivision of land; or

    (d) environmental protection

    if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.

6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.

7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.

8. Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.

9. Title being vested other than as stated in Schedule A or being defective

   (a) as a result of the avoidance in whole or in part, or from a court order providing an alternative remedy, of a transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction vesting Title as shown in Schedule A because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or

   (b) because the instrument of transfer vesting Title as shown in Schedule A constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records
      (i) to be timely, or
      (ii) to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.

10. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 9 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

IN WITNESS WHEREOF, COMMONWEALTH LAND TITLE INSURANCE COMPANY has caused this policy to be signed and sealed by its duly authorized officers.

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**

SEAL

By: _____

ATTEST

_____ President

_____ Secretary

Countersigned: _____
Authorized Signature

ALTA Owner's Policy (6-17-06)

File No. 13-002176
Commercial Connection No. 17712144

Policy No. 

## COMMONWEALTH LAND TITLE INSURANCE COMPANY
## OWNER'S POLICY OF TITLE INSURANCE

### SCHEDULE A

Amount of Insurance:   $104,832,925.00

Date of Policy: March 31, 2014, at 2:57 PM

1.   Name of Insured:

   ICG 16th Street Associates, LLC, a Delaware limited liability company

2.   The estate or interest in the Land described or referred to herein is:

   FEE SIMPLE

3.   Title to the estate or interest in the Land is vested in:

   ICG 16th Street Associates, LLC, a Delaware limited liability company, by virtue of Special Warranty Deed dated as of April 12, 2007 and recorded April 12, 2007 as Instrument No. 2007050783.

4.   The Land referred to in this policy is situate in the District of Columbia and is described as follows:

<div align="center">See attached Exhibit "A"</div>

Countersigned: _____

<div align="center">

Sarah Eckert Webb

Authorized Officer or Authorized Signatory

*Valid Only If Schedule B and Cover Are Attached*

</div>

ALTA Owner's Policy (2006)

File No. 13-002176                                                      Policy No. 
Commercial Connection No. 17712144

### COMMONWEALTH LAND TITLE INSURANCE COMPANY
### OWNER'S POLICY OF TITLE INSURANCE

#### SCHEDULE B
#### EXCEPTIONS FROM COVERAGE

NOTE: Any exception contained in this Policy for covenants, conditions or restrictions expressly omits any covenants, conditions or restrictions, if any, based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant, condition or restriction is permitted by applicable law.

This Policy does not insure against loss or damage (and the Company will not pay costs, attorney's fees or expenses) which arise by reason of:

1.    Real estate taxes and general and special assessments, if any, subsequent to March 31, 2014, a lien not yet due and payable; and in addition thereto, possible future tax levies or possible public charges that have been levied or assessed but are not due and payable at Date of Policy.

2.    Business Improvement District Taxes arising subsequent to September 30, 2014, a lien not yet due and payable.

3.    Public Space Rental Payments (Vault Rent, CAFÉ Assessments) arising subsequent to June 30, 2014, a lien not yet due and payable.

4.    Water and sewer charges arising in connection with the Land subsequent to the original Date of Policy, a lien not yet due and payable.

5.    Agreement relating to the Occupation of Sub-surface Public Space (Vaults) dated November 10, 1969 and recorded November 25, 1969 as Instrument No. 23958 in Liber 13054 at folio 582, noted on ALTA/ACSM Land Title Survey entitled "Square 185 Lot 41, Washington, D.C." prepared by KCI Technologies, Jefferson D. Lawrence, License No. 900570, dated January 21, 2014, last revised February 20, 2014, KCI Job Nos. 2914899, 04110633 and 16065039.01 (the "Survey").

6.    The Survey also discloses the following:

      a.    Projection of southwest overhang into public space (I Street, N.W.).
      b.    Projection of overhanging bell tower into public space (16th Street, N.W.)
      c.    Projection of underground parking spaces into Sub-surface Public Space.

7.    Declaration of Covenants and Restrictions by and between ICG 16th Street Associates, LLC, the District of Columbia Water and Sewer Authority and others, dated October 28, 2013, and recorded November 15, 2013, as Instrument No. 2013128570, noted on the Survey.

File No. 13-002176                                                              Policy No. 
Commercial Connection No. 17712144

8.      Planned Unit Development Covenant (ICG 16th Street Associates-Z.C. Order No 13-04)
        by and between ICG 16th Street Associates, L.L.C. and the District of Columbia, dated
        November 11, 2013, and recorded December 5, 2013, as Instrument No 2013134741,
        noted on the Survey.

9.      Declaration of Covenants for a Stormwater Management Facility by and between ICG
        16th Street Associates, LLC, a Delaware limited liability company, for the benefit of the
        District of Columbia, dated January 17, 2014 and recorded January 17, 2014 as
        Instrument No. 2014006184.

10.     Agreement Relating to the Occupation of Sub-Surface Public Space (Vaults) dated as of
        February 24, 2014 and recorded February 26, 2014 as Instrument No. 2014017419.

11.     Deed of Trust, Assignment of Rents and Leases, Security Agreement and Financing
        Statement dated as of March 28, 2014 from ICG 16th Street Associates, LLC, a Delaware
        limited liability company, to PRLAP, Inc., a Virginia corporation, as Trustee, securing
        Bank of America, N.A. a national banking association, Administrative Agent, and
        recorded on March 31, 2014 as Instrument No. 2014028360 in the original principal
        amount of $73,000,000.00.

12.     UCC-1 from ICG 16th Street Associates, LLC, Debtor, to Bank of America, N.A.,
        Administrative Agent, Secured Party, recorded on March 31, 2014 as Instrument No.
        2014028361  (District of Columbia Land Records).

13.     UCC-1 from ICG 16th Street Associates, LLC, Debtor, to Bank of America, N.A.,
        Administrative Agent, Secured Party, recorded on April 1, 2014 as Filing No. 2014
        1415363  (Delaware Secretary of State).

14.     Pending such time as the improvements contemplated upon the insured premises shall be
        completed, liability hereunder is limited to $45,700,446.64, the present value of the
        insured estate; but as and when the erection of such improvements shall be commenced,
        liability hereunder shall increase, as the improvements progress, in the amount of the cost
        thereof, up to the face amount of this Policy.

(End of Schedule B)

3

File No. 13-002176
Commercial Connection No. 17712144

Policy No. 

## EXHIBIT "A"

All that certain lot or parcel of land together with all improvements thereon located and being in the City of Washington in the District of Columbia and being more particularly described as follows:

Lot numbered Forty-one (41) in Square numbered One Hundred Eighty-five (185) in the subdivision made by The Christian Science Board of Directors of The First Church of Christ, Scientist in Boston Massachusetts, as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 154 at folio 45.

NOTE: The above lot being more particularly described as follows:

Beginning at a point said point being the Northwest corner of the intersection of I (EYE) Street and 16th Street North West. Thence running west with the North line of I (EYE) Street.

1.  S89° 55' 02" W 83.25 feet (M) & (R) to a point marking the corner of Lot 41 and Lot 46 of Square 185. Thence running with the line of division between Lot 41 and Lot 46 of Square 185 the following two courses

2.  N00° 05' 00" W 102.47 feet (M) 102.50 feet (R) to a point, thence running

3.  N89° 59' 58" W 23.25 feet (M) & (R) to a point, said point also being common with a public alley. Thence running north with the East line of division for the variable width Public Alley and Lot 41,

4.  N00° 00' 02" E 84.15 feet (M) 84.04 feet (R) to a point marking the corner for the Public Alley, Lot 41 and Lot "Of 5", thence running East with the line of division between Lot 41 and the Lot "Of 5",

5.  S89° 59' 58" E 106.65 feet (M) 106.50 feet (R) to a point in the West line of 16th Street, thence running with the West line of 16th Street

6.  S00° 00' 02" W 186.50 feet (M) 186.54 feet (R) to the point of beginning, containing 14517 square feet or 0.334 acres more or less.

(End of Exhibit "A")

# ALTA ENDORSEMENT – FORM 3.2-06 – ZONING – LAND UNDER DEVELOPMENT

Issued by Commonwealth Land Title Insurance Company

 Commonwealth

File No.: 13-002176

Attached to and made a part of Policy No.: 

1.  For purposes of this endorsement:

    a.  "Improvement" means a building, structure, road, walkway, driveway, curb, surface utility or water well existing at Date of Policy or to be built or constructed according to the Plans that is or will be located on the Land, but excluding crops, landscaping, lawns, shrubbery, or trees.

    b.  "Plans" means those site and elevation plans made by Cooper Carry (Architect of Record) and Robert A.M. Stern Architects, LLP (Design Architect), dated September 23, 2013, Project Name, 900 16th Street, Project No. 20120357.

2.  The Company insures against loss or damage sustained by the Insured in the event that, at Date of Policy

    a.  according to applicable zoning ordinances and amendments, the Land is not classified Zone C-3-C;

    b.  the following use or uses are not allowed under that classification: a church or place of worship, office, retail, housing, hotel and mixed use development, including off-street parking use, as a matter of right.

    c.  There shall be no liability under paragraph 2.b. if the use or uses are not allowed as the result of any lack of compliance with any condition, restriction, or requirement contained in the zoning ordinances and amendments, including but not limited to the failure to secure necessary consents or authorizations as a prerequisite to the use or uses. This paragraph 2.c. does not modify or limit the coverage provided in Covered Risk 5.

3.  The Company further insures against loss or damage sustained by the Insured by reason of a final decree of a court of competent jurisdiction either prohibiting the use of the Land, with any existing Improvement, as specified in paragraph 2.b. or requiring the removal or alteration of the Improvement, because of a violation of the zoning ordinances and amendments in effect at Date of Policy with respect to any of the following matters:

    a.  Area, width, or depth of the Land as a building site for the Improvement

    b.  Floor space area of the Improvement

    c.  Setback of the Improvement from the property lines of the Land

    d.  Height of the Improvement, or

    e.  Number of parking spaces.

[continued]

ALTA Endorsement
Form 3.2-06 – Zoning -- Land Under Development
Policy No. ▮▮▮▮▮▮▮▮▮
Page Two (2)

4.  There shall be no liability under this endorsement based on:

    a.  the invalidity of the zoning ordinances and amendments until after a final decree of a court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses;

    b.  the refusal of any person to purchase, lease or lend money on the Title covered by this policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

IN WITNESS WHEREOF, the Company has caused this Endorsement to be signed with the facsimile signatures of its President and Secretary and sealed as required by its By-Laws.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Dated: March 31, 2014

By:

Countersigned:

By: _____
    Sarah Eckert Webb
    Authorized Officer or Agent

**SEAL**

Attest:

President

Secretary

End. – ALTA Form 3.2-06 – Zoning – Land Under Development (4/2/12)
Form 6556-31C

## ALTA ENDORSEMENT – FORM 8.2-06 – COMMERCIAL ENVIRONMENTAL PROTECTION LIEN

Issued by **Commonwealth Land Title Insurance Company**

 Commonwealth

File No: 13-002176

Attached to and made a part of Policy Number: 

The Company insures against loss or damage sustained by the insured by reason of an environmental protection lien that, at Date of Policy, is recorded in the Public Records or filed in the records of the clerk of the United States district court for the district in which the Land is located, unless the environmental protection lien is set forth as an exception in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

IN WITNESS WHEREOF, the Company has caused this Endorsement to be signed with the facsimile signatures of its President and Secretary and sealed as required by its By-Laws.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Dated: March 31, 2014

By:

Countersigned:

President

By:

Sarah Eckert Webb
Authorized Officer or Agent

Attest:

Secretary

End. -- ALTA Form 8.2-06
Commercial Environmental Protection Lien (Rev. 10/16/08)

ALTA ENDORSEMENT – FORM 9.1-06 – COVENANTS, CONDITIONS AND RESTRICTIONS – UNIMPROVED LAND

Issued by **Commonwealth Land Title Insurance Company**

 Commonwealth
LAND TITLE INSURANCE COMPANY

File No.: 13-002176

Attached to and made a part of Policy No.: 

1. The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For the purposes of this endorsement only, "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation; or

   b. A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a. any Covenant contained in an instrument creating a lease;

   b. any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

   c. except as provided in Section 3.b, any Covenant pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

IN WITNESS WHEREOF, the Company has caused this Endorsement to be signed with the facsimile signatures of its President and Secretary and sealed as required by its By-Laws.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Dated: March 31, 2014

By: _____

Countersigned:                                                                           _President_

By: _Sarah Eckert Webb_
    Sarah Eckert Webb
    Authorized Officer or Agent

(SEAL)

Attest: _____
                                                                                      _Secretary_

## ALTA ENDORSEMENT – FORM 17-06 – ACCESS AND ENTRY

Issued by **Commonwealth Land Title Insurance Company**

 Commonwealth

File No. 13-002176

Attached to and made a part of Policy No.: 

The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) the Land does not abut and have both actual vehicular and pedestrian access to and from Public Alley (via K Street) (the "Street"), (ii) the Street is not physically open and publicly maintained, or (iii) the Insured has no right to use existing curb cuts or entries along that portion of the Street abutting the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

IN WITNESS WHEREOF, the Company has caused this Endorsement to be signed with the facsimile signatures of its President and Secretary and sealed as required by its By-Laws.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Dated: March 31, 2014

By:

President

Countersigned:

Attest:

By:
Sarah Eckert Webb
Authorized Officer or Agent

Secretary

End. – ALTA Form 17-06 – Access and Entry – (8/17/06)
Form 5556-17C

NJRB 5-116 (2/15/07)

# ALTA ENDORSEMENT – FORM 18-06 – SINGLE TAX PARCEL

## Issued by Commonwealth Land Title Insurance Company

 Commonwealth
LAND TITLE INSURANCE COMPANY

File No. 13-002176

Attached to and made a part of Policy No.: 

The Company insures against loss or damage sustained by the Insured by reason of the Land being taxed as part of a larger parcel of land or failing to constitute a separate tax parcel for real estate taxes.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

IN WITNESS WHEREOF, the Company has caused this Endorsement to be signed with the facsimile signatures of its President and Secretary and sealed as required by its By-Laws.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Dated:  March 31, 2014

By: _____

President

Countersigned:

By: _____
Sarah Eckert Webb
Authorized Officer or Agent

SEAL

Attest: _____

Secretary

End. – ALTA Form 18-06 – Single Tax Parcel (6/17/06)
Form 5556-18C

NJRB 6-117 (2/16/07)

# ALTA ENDORSEMENT – FORM 25-06 – SAME AS SURVEY

Issued by **Commonwealth Land Title Insurance Company**

 Commonwealth
LAND TITLE INSURANCE COMPANY

File No. 13-002176

Attached to and made a part of Policy No.: 

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land as described in Schedule A to be the same as that identified on ALTA/ACSM Land Title Survey entitled "Square 185 Lot 41, Washington, D.C." prepared by KCI Technologies, Jefferson D. Lawrence, License No. 900570, dated January 21, 2014, last revised February 20, 2014, KCI Job Nos. 2914899, 04110633 and 16065039.01.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

IN WITNESS WHEREOF, the Company has caused this Endorsement to be signed with the facsimile signatures of its President and Secretary and sealed as required by its By-Laws.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Dated: March 31, 2014

By: _____
President

Countersigned:

By: _____
Sarah Eckert Webb
Authorized Officer or Agent

Attest: _____
Secretary

*(SEAL – COMMONWEALTH LAND TITLE INSURANCE COMPANY NEBRASKA)*

Endorsement – ALTA Form 25-06 – Same As Survey (10/16/08)

# ALTA ENDORSEMENT – FORM 26-06 – SUBDIVISION

Issued by **Commonwealth Land Title Insurance Company**

 Commonwealth
LAND TITLE INSURANCE COMPANY

File No. 13-002176

Attached to and made a part of Policy No. █████████

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land to constitute a lawfully created parcel according to the subdivision statutes and local subdivision ordinances applicable to the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

IN WITNESS WHEREOF, the Company has caused this Endorsement to be signed with the facsimile signatures of its President and Secretary and sealed as required by its By-Laws.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Dated: March 31, 2014

By: _____
President

Countersigned:

By: _____
Sarah Eckert Webb
Authorized Officer or Agent

SEAL
NEBRASKA

Attest: _____
Secretary

Endorsement – ALTA Form 26-06 – Subdivision (10/16/08)

# DELETION OF ARBITRATION PROVISION ENDORSEMENT

Issued by Commonwealth Land Title Insurance Company

 **Commonwealth**
LAND TITLE INSURANCE COMPANY

File No.: 13-002176

To be annexed to and form a part of Policy No. 

The said Policy is hereby amended in the following manner:

Item 14 of the Conditions and Stipulations (Arbitration) is hereby deleted.

The total liability of the Company under said Commitment/Policy and any endorsements attached thereto shall not exceed, in the aggregate, the face amount of said policy and costs which the Company is obligated under the provisions of said Commitment/Policy to pay.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

IN WITNESS WHEREOF, COMMONWEALTH LAND TITLE INSURANCE COMPANY has caused its corporate name and seal to be hereunto affixed by its duly authorized officers, the Endorsement to become valid when countersigned by an authorized officer or agent of the Company.

COMMONWEALTH LAND TITLE INSURANCE COMPANY

Dated:  March 31, 2014

By:

President

Countersigned:

By:

Sarah Eckert Webb
Authorized Officer or Agent

SEAL

Attest:

Secretary

ORIGINAL

# EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
     (i)   the occupancy, use, or enjoyment of the Land;
     (ii)  the character, dimensions, or location of any Improvement erected on the Land;
     (iii) the subdivision of land; or
     (iv)  environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters :
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   (a) a fraudulent conveyance or fraudulent transfer; or
   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

## CONDITIONS

**1. DEFINITION OF TERMS**
   The following terms when used in this policy mean:
   (a) "Amount of Insurance": The amount stated in Schedule A, as may be in-creased or decreased by endorsement to this policy, increased by Section 8(b), or decreased by Sections 10 and 11 of these Conditions.
   (b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.
   (c) "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.
   (d) "Insured": The Insured named in Schedule A.
      (i)  The term "Insured" also includes
         (A) successors to the Title of the Insured by operation of law as dis-tinguished from purchase, including heirs, devisees, survivors, personal representatives, or next of kin;
         (B) successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;
         (C) successors to an Insured by its conversion to another kind of Entity;
         (D) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title
            (1) If the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,
            (2) If the grantee wholly owns the named Insured,
            (3) If the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity, or
            (4) if the grantee is a trustee or beneficiary of a trust created by a written instrument established by the Insured named in Schedule A for estate planning purposes.
      (ii) With respect to (A), (B), (C), and (D) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured.
   (e) "Insured Claimant": An Insured claiming loss or damage.
   (f) "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.
   (g) "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any prop-erty beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.
   (h) "Mortgage": Mortgage, deed of trust, trust deed, or other security instru-ment, including one evidenced by electronic means authorized by law.
   (i) "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental pro-tection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.
   (j) "Title": The estate or interest described in Schedule A.
   (k) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

**2. CONTINUATION OF INSURANCE**
   The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

**3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT**
   The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured hereunder of any claim of title or interest that is adverse to the Title, as Insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title, as Insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

**4. PROOF OF LOSS**
   In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

**5. DEFENSE AND PROSECUTION OF ACTIONS**
   (a) Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other

counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b) The Company shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c) Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

6. DUTY OF INSURED CLAIMANT TO COOPERATE

(a) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b) The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

7. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance.
To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay.
Upon the exercise by the Company of this option, all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in this subsection, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b) To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.
   (i) To pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

   (ii) To pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

8. DETERMINATION AND EXTENT OF LIABILITY

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the lesser of
   (i) the Amount of Insurance; or
   (ii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy.

(b) If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title, as insured,
   (i) the Amount of Insurance shall be increased by 10%, and
   (ii) the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c) In addition to the extent of liability under (a) and (b), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

9. LIMITATION OF LIABILITY

(a) If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title, as insured.

(c) The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY

All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment.

11. LIABILITY NONCUMULATIVE

The Amount of Insurance shall be reduced by any amount the Company pays under any policy insuring a Mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject, or which is executed by an Insured after Date of Policy and which is a charge or lien on the Title, and the amount so paid shall be deemed a payment to the Insured under this policy.

12. PAYMENT OF LOSS

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

13. RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT

(a) Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.
If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b) The Company's right of subrogation includes the rights of the Insured to

indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

### 14. ARBITRATION

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

### 15. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT

(a) This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage that arises out of the status of the Title or by any action asserting such claim shall be restricted to this policy.

(c) Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d) Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the en-

dorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

### 16. SEVERABILITY

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

### 17. CHOICE OF LAW; FORUM

(a) Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b) Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

### 18. NOTICES, WHERE SENT

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at

**Commonwealth Land Title Insurance Company**
P.O. Box 45023, Jacksonville, Florida 32232-5023
Attn: Claims Department

ALTA Owner's Policy (6-17-06)

| From: | Oscar Pérez |
|---|---|
| To: | jklein@jbg.com; jbrunelle@jbg.com; knorth@jbg.com; hhoward@jbg.com |
| CC: | stevesmith@coopercarry.com; MTamaro@ThorntonTomasetti.com; PDrake@ThorntonTomasetti.com |
| ient: | 3/24/2014 2:24:17 PM |
| Subject: | 900 16th Street - 1600K party wall encroachment. |
| Attachments: | 900 16th street_wall survey east elevation exhibit- op comment 3-23-14.pdf; 1600 k south wall image 1.jpg; 1600k south wall photo 2.jpg; 1600k south wall photo 3.jpg; 1600k south wall photo 4.jpg |

I went by the site yesterday afternoon, and spent about an hour looking at the party wall. We have much more serious issues than just how to clad the wall. I discovered that the party wall is encroaching on the 900 16th street property far more to the south than the Wiles Mensch survey indicated. We accounted for a 4" encroachment based on the WM survey, but the real encroachment is likely 12" or maybe more (the 4" WM assumed plus at least the width of one additional brick course as seen in the photos).

Attached is Wiles Mensch Survey. They assume the joint between the 2 buildings that was visible on the 16th street façades was the actual party wall for 1600K. Now that it is uncovered, as you can see in the photo's I took yesterday, the brick wall bulges out on the 8th floor to the south well beyond the joint line. Based on what I saw, I believe that the south wall of 1600K was built as a true 2' thick brick party wall straddling the property line, and not as a stand alone wall.

We can't shift the new building south, especially with the intricacies of the church facade, and tight core. So we need to huddle and discuss options quickly as it affects everything from foundations to precast, to leasing documents.


Oscar A. Perez, AIA
Director of Design Services

COOPER CARRY
THE CENTER FOR CONNECTIVE ARCHITECTURE

625 NORTH WASHINGTON STREET, SUITE 200, ALEXANDRIA, VA 22314
DIR (703) 462-0626   MAIN (703) 519-6152  ·  Cell (202) 431-3244  ·  FAX (703) 519-7127  ·  WWW.COOPERCARRY.COM

ATLANTA  ·  NEW YORK  ·  WASHINGTON

Notice: This message contains privileged and confidential information intended only for the use of the addressee named above. If you are not the intended recipient of this message, you are hereby notified that you may not disseminate, copy or take any action in reliance on it. If you have received this message in error, please notify Cooper Carry in Atlanta, GA, USA (404) 237-2000.

Please consider the environment before printing this e-mail

EXHIBIT

J

## SPERDUTO THOMPSON PLC

1133 Twentieth Street, N.W. – Second Floor
Washington, D.C. 20036
Tel. (202) 408-8900 – Fax (202) 408-8910
pthompson@sperdutothompson.com
www.sperdutothompson.com

Peter G. Thompson

September 17, 2014

VIA CERTIFIED MAIL

Commonwealth Land Title Insurance Company
P.O. Box 45023
Jacksonville, FL 32232-5023
Attn: Claims Department

     Re:   Insured:     ICG 16th Street Associates, LLC
           Policy No.:    ▇▇▇▇▇▇▇▇▇▇

To Whom It May Concern:

     This firm has been engaged to represent the interests of ICG 16th Street Associates, LLC ("ICG 16th") with respect to the matters described herein. The purpose of this letter is to provide Notice of Claim, on behalf of ICG 16th, pursuant to Condition 3 of Policy Number 81306-11156 (the "Policy"), issued by Commonwealth Land Title Insurance Company ("Commonwealth"). The Policy, pursuant to its terms and conditions, affords coverage with respect to Land described more fully in the Policy's Exhibit "A" (the "Land"). The Land is located at the Northwest corner of 16th and Eye Streets, NW, in Washington, D.C., and is familiarly known, and occasionally will be referred to in this letter, as "900 16th."

     At the time ICG 16th acquired the Land, it was occupied by the Christian Science Monitor Building (the "Monitor Building") and a Christian Scientist church. The Monitor Building was an L-shaped structure in which the longer leg of the "L" ran along the north boundary of the Land and directly abutted an adjoining building to the north, known familiarly as "1600 K."[1] ICG 16th's plans for the site required the demolition of the Monitor Building and the church building, and the erection of a new commercial office building that also would extend to the north boundary of the Land. In early 2014, and in conjunction with the issuance of the Policy, a survey entitled "ALTA/ACSM Land Title Survey – Square 185 Lot 41, Washington, D.C." (the "Survey") was prepared by KCI Technologies, and last revised on February 20, 2014. (See Survey attached hereto as Exhibit A.) With respect to the condition on the property line between 1600 K and 900 16th, the Survey included a corner detail apparently showing one

---

[1] Commonwealth also affords Title Insurance coverage with respect to 1600 K under Policy No. 81306-2946 (the "1600 K Policy"), issued to 1600 Capital Associates LLC. Because the ownership entities of the two properties are, though not identical, both affiliated with the JBG Companies, the circumstances described in this letter have been addressed without the need for litigation between the two entities and appropriate costs have been allocated to the 900 16th project. A separate communication, providing a precautionary Notice of Claim under the 1600 K Policy, is being sent to Commonwealth under separate cover.

EXHIBIT
K

Commonwealth Land Title Insurance Company
September 17, 2014
Page 2

location where the face of the 1600 K building's south wall was approximately four-tenths of a foot south of the line (see circled detail at top of Exhibit A). The Survey declared, in Item 10 of its "General Notes," that "[t]he Subject property shares no party walls with adjoining properties."[2]

Unfortunately, following demolition of the Monitor Building in March 2014, and upon further investigation, it was discovered that the Survey did not reflect the condition that existed along the north side of the Land. In particular, it was determined that the south wall of 1600 K sat entirely south of the property line, i.e., on the Land, and that there was, consequently, an approximately twelve-inch encroachment over the entirety of property line.

The wall, in effect, had two sections: (1) from the ground through the eighth-floor level, there was a parge-coated wall that was determined to consist of three layers of red brick, sitting entirely on the Land, and (2) from the ninth through eleventh-floor levels there was a wall consisting of one layer of yellow brick, which sat directly upon the red brick wall below and depended upon the red brick wall for support. (See photo attached hereto as Exhibit B.) Further investigation revealed that the red brick portion was apparently the remnant of an old hotel, known as the Gordon Hotel, that had stood on the 900 16th site prior to the construction of the Monitor Building, and that still had been standing when 1600 K was built in the 1950's. (See photo attached hereto as Exhibit C.) The yellow brick portion was tied structurally into the 1600 K building, while the red brick portion (upon which the yellow brick portion depended for support) was attached to 1600 K only by means of steel bracing that apparently had been added, along with the parge coating, in approximately 1970, at the time that the Gordon Hotel was demolished but before the Monitor Building was constructed.

Following careful inspection and evaluation by the 900 16th design and engineering team, it was determined that both the red and yellow brick portions of the wall had to be completely demolished. This determination was made for many reasons, chief among them construction worker safety and the fact that a re-design of 900 16th to reduce the width of the building by at least eight additional inches would have had time and cost impacts (including very substantial delay penalties that would have been owed to the lead tenant) far greater than the cost of demolishing the encroaching wall and dealing appropriately with the south side of 1600 K. Accordingly, demolition began in early May 2014, working from the top floor down. It proved to be a complicated process, with a variety of conditions found behind the red brick wall, but above-grade demolition and waterproofing were completed by the end of May 2014, followed by ongoing below-grade work. Costs are still being incurred, but through August 22, 2014, totaled $1,777,748. (See summary attached hereto as Exhibit E.) This figure is preliminary and subject to adjustment.

The costs in question clearly are covered by the Policy. Among other provisions, the Policy affords coverage for "[a]ny encroachment . . . variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete survey of the Land." (Policy, Covered Risk 2(c).) Additionally, the "Same as Survey Endorsement" provides coverage for

---

[2] KCI Technologies also had surveyed the 1600 K site in conjunction with the issuance of the 1600 K Policy. That survey, like the one subsequently performed with respect to 900 16th, also did not reflect the presence of the encroachment. (See 1600 K Survey attached hereto as Exhibit D.)

Commonwealth Land Title Insurance Company
September 17, 2014
Page 3

"loss or damage sustained by the Insured by reason of the failure of the Land as described in
Schedule A to be the same as that identified on the ALTA/ACSM Land Title Survey prepared by
KCI Technologies dated December 2, 2010, certified February 28, 2011, Job No. 29101265."
Finally, the Policy does not refer to any encroachment across the property line in its Schedule of
Exceptions from Coverage. (Policy, Schedule B.).

ICG 16th stands ready to provide any additional information, including additional
photographs, that Commonwealth may require. Thank you in advance for your prompt attention
to this matter.

Sincerely yours,

Peter G. Thompson

cc:    Benjamin Jacobs, JBG
       Livya Heithaus, JBG
       Heather Howard, JBG

# EXHIBIT A



# EXHIBIT B



South Elevation

# EXHIBIT C

30137v.jpg (JPEG Image, 794 × 1024 pixels) - Scaled (86%)

http://lcweb2.loc.gov/service/pnp/npcc/30100/30137v.jpg



9/17/2014 10:16 AM

# EXHIBIT D



# EXHIBIT E

1600 K Street
Party Wall Cost Tracking
Updated:        8/22/2014

| Change Order | COR | Description | Cost Impact | Schedule Impact |
|---|---|---|---|---|
| 4 | 47 | Celtic 1600 K Wall Demolition Costs through 5/10/2014 | $39,465 | TBD |
| 4 | 48 | Demolition Incentive Pay for Saturday 5/24/2014 | $1,431 | TBD |
| 5 | 21 | 1600K Party Wall Demolition-through 6/6/2014 | $268,683 | TBD |
| 6 | 51 | 1600K Below Grade Demolition and Wall Work | $76,261 | TBD |
| TBD | TBD | 1600K Party Wall – Permanent Façade Construction | $350,000 | TBD |
| TBD | TBD | Schedule Delay Costs (premium to 1/31/15 2nd floor slab) | $351,205 | ~39 days |
| TBD | TBD | Costs to Meet Tenant Schedule | $600,000 | |
| N/A | N/A | Cooper Carry Add'l Services Invoice | $5,346 | N/A |
| N/A | N/A | Cooper Carry Add'l Services Invoice 0146896 | $24,387 | N/A |
| N/A | N/A | Cooper Carry Add'l Services Wall Redesign Estimate | $50,000 | N/A |
| N/A | N/A | Day Porter Cleaning Services due to debris from wall | $10,970 | N/A |
| Total | | | $1,777,748 | 39 |

# SPERDUTO THOMPSON PLC

1133 TWENTIETH STREET, N.W. – SECOND FLOOR
WASHINGTON, D.C. 20036
TEL. (202) 408-8900 – FAX (202) 408-8910
pthompson@sperdutothompson.com
www.sperdutothompson.com

PETER G. THOMPSON

November 17, 2014

**VIA CERTIFIED MAIL**

Commonwealth Land Title Insurance Company
P.O. Box 45023
Jacksonville, FL 32232-5023
Attn: Claims Department

|   | Re: | Insured: | ICG 16th Street Associates, LLC |
|---|-----|----------|---------------------------------|
|   |     | Policy No.: |                                 |

To Whom It May Concern:

This firm has been engaged to represent the interests of ICG 16th Street Associates, LLC ("ICG 16th") with respect to the matters described herein. The purpose of this letter is to provide Notice of Claim, on behalf of ICG 16th, pursuant to Condition 3 of Policy Number 06-001361 (the "Policy"), issued by Commonwealth Land Title Insurance Company ("Commonwealth"). The Policy, pursuant to its terms and conditions, affords coverage with respect to Land described more fully in the Policy's Exhibit "A" (the "Land"). The Land is located at the Northwest corner of 16th and Eye Streets, NW, in Washington, D.C.

The circumstances giving rise to this notice already have been described in a notice letter sent to you on or about September 17, 2014, invoking the provisions of a subsequent policy also issued by Commonwealth, namely Policy Number 81306-11156. We incorporate by reference the entirety of that prior notice letter. The present notice is provided as a precautionary matter in the event it may be determined that Policy No. 06-001361 is applicable to the circumstances at issue. A copy of this letter is being sent to J. Keith M. Sands, Esq., who already is handling the claim reported under Policy Number 81306-11156.

Thank you in advance for your prompt attention to this matter.

Sincerely yours,

Peter G. Thompson

EXHIBIT
L

Commonwealth Land Title Insurance Company
November 17, 2014
Page 2

cc:    Benjamin Jacobs, JBG
       Livya Helthaus, JBG
       Heather Howard, JBG
       J. Keith M. Sands, Esq. (via email)

Payment Details Report

Company: Fidelity National Financial
Requestor: Dalley, Brittany
Run Date: 12/21/2015 1:05:28 PM EST

**Bank of America**
**Merrill Lynch**

Domestic High Value (Wire)
Payment Category: Urgent Wire

Status: Confirmed by Bank
Transaction Number: 15CLC1950BDG0923

Debit Account Information

Debit Bank:
Debit Account:
Debit Account Name: COMMONWEALTH LAND TITLE INS CO
Debit Currency: USD

Beneficiary Details

Beneficiary Name: JACKSON CAMPBELL PC
Beneficiary Address: NA
Beneficiary City: NA
Beneficiary Postal Code: NA
Beneficiary Country: US - United States of America

Beneficiary Account:
Beneficiary Bank ID:

PNC BANK, NATIONAL ASSOCIATION
702 N BROAD ST
PHILADELPHIA
US - United States of America

Beneficiary Email:
Beneficiary Mobile Number:

Payment Details

Credit Currency: USD
Credit Amount: 950,000.00

Value Date: 12/21/2015

Optional Information

Sender's Reference Number: 15CLC1950BDG0923

Beneficiary Information: CLAIM 499131

Additional Routing

Intermediary Bank ID:

Receiver Information:

Control Information

Input: howard
Approver: howard
Approved: bdalley
Initial Confirmation: WTX:2015122100300411
Confirmation #: FEOR:2015122186R7HU2R008911

Input Time: 12/21/2015 12:19:50 PM EST
Time: 12/21/2015 12:20:04 PM EST
Time: 12/21/2015 12:26:26 PM EST

EXHIBIT

M

1600 K Street
Party Wall Cost Tracking
Updated:    7/24/2015

| Change Order | COR | Description | Cost Impact | Schedule Impact | Comments |
|---|---|---|---|---|---|
| 4 | -77 | Cable 1600 K Wall Demolition Costs through 3/10/2014 | $39,465 | | |
| 4 | 48 | Demolition Incentive Pay for Saturday 5/24/2014 | $1,431 | | |
| 5 | 21 | 1600K Party Wall Demolition through 6/6/2014 | $263,683 | | |
| 6 | 51 | 1600K Below Grade Demolition and Wall Work | $75,312 | | |
| 10 | 95 | Schedule Delay Costs (premium to 1/31/15 2nd floor slab) | $0 | 36 work days | |
| 11 | 71 | 1600K Interior Bathroom Repair Work | $15,373 | | |
| 11 | 77 | Increase Size of Foundation along 1600 K St Wall | $13,570 | | |
| 14 | 99 | Exploratory Work of 1600 K St Building Structure | $10,571 | | |
| 14 | 122 | Temporary Protection of 1600 K St Exposed Framing | $49,427 | | |
| 17 | 128 | Subcontractor Costs from Extended Excavation Schedule | $151,871 | | |
| 20 | 154 | 1600K Wall Construction - Level P1-05 - Part 1 | $100,562 | | |
| 20 | 165 | M&L & MEP OT Through mid 01/2015 | $18,523 | | |
| 23 | 179 | M&L & MEP OT Through mid 02/2015 | $72,581 | | |
| 23 | 182 | 1600K South Facade - Exposed Limestone Wall | $135,072 | | |
| 26 | 193 | M&L Acceleration mid-February thru mid-March | $28,517 | | |
| 26 | 192 | Schedule Impact Due to 1600 K Wall-Below Grade | $0 | 15 work days | |
| 31 | 185 | 1600 K -Swing Stage Costs (through 2/14/15) | $11,025 | | |
| 31 | 195 | 1600K Wall -Cost Reconciliation | $30,000 | | |
| 31 | 197 | M&L Acceleration for April Bill | $120,599 | | |
| 33 | 211 | M&L Acceleration for May Bill | $70,599 | | |
| 33 | 214 | 1600 K Wall Demo and Put Back-Demo/Masonry/CMU | $258,479 | | |
| 33 | 217 | Miller & Long Incentive Bonus | $127,744 | | |
| 33 | 222 | 1600 K -Furnish and Install Grace Monokote Z-154 | $61,272 | | |
| 36 | 228 | 1600 K-WCPR 22c-Costs for June Bill | $191,866 | | |
| TBD | TBD | Davis Construction Extended GCs for COR 95 | $200,000 | | IBG estimate prior to receiving full design and pricing from Davis Construction |
| TBD | TBD | 1600 K Party Wall - Remaining Facade Construction | $50,000 | | IBG estimate prior to receiving full design and pricing from Davis Construction |
| TBD | TBD | 1600 K St Reimbursement for COR 214 Window Infill | ($135,913) | | 1600 K St ownership reimbursement for "elective" work undertaken as part of the facade replacement |
| N/A | N/A | Tenant Holdover Rent Reimbursement | $550,000 | | 3-month holdover rent estimate per ongoing negotiations with current Miller & Chevalier landlord |
| N/A | N/A | Cooper Carry Add'l Services Invoice #0146252 | $4,515 | | Invoice attached |
| N/A | N/A | Cooper Carry Add'l Services Invoice #0146896 | $24,387 | | Invoice attached |
| N/A | N/A | Cooper Carry Add'l Services Invoice #0148471 | $36,733 | | Invoice attached |
| N/A | N/A | Cooper Carry Add'l Services Invoice #0148697 | $3,155 | | Invoice attached |
| N/A | N/A | Cooper Carry Add'l Services Wall Redesign Estimate | $70,000 | | IBG estimate prior to receiving full design and pricing from Cooper Carry |
| N/A | N/A | Clearing Debris Services Invoice #460023-EXTRA DAY POR | $10,970 | | Invoice attached |
| Total | | | $2,666,379 | 51 work days | |

EXHIBIT
N